FRANK E. ZORNIGER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MARY A. ZORNIGER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3467–70, 3468–70.    Filed June 27, 1974.

*William A. Cromartie, Henry deVos Lawrie, Jr., Samuel H. Horne,* and *Douglas L. Barnes,* for the petitioners.
*Nelson E. Shafer,* for the respondent.

GOFFE, *Judge:* The Commissioner determined deficiencies in gift taxes for the taxable year 1966 against petitioner Frank E. Zorniger (docket No. 3467–70) in the amount of $63,220.05 and against petitioner Mary A. Zorniger (docket No. 3468–70) in the amount of $63,220.05. The issues for decision are: (1) Whether the fair market value for gift tax purposes and for purposes of a "bargain sale" of corporate stock of a Chevrolet dealership is limited to the net fair market value of the tangible assets of the corporation or whether some value may be ascribed to goodwill; and (2) whether the burden of proof was shifted to respondent under Rule 142, Tax Court Rules of Practice and Procedure, when he asserted a lower fair market value at trial than he determined in his statutory notice of deficiency.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached are incorporated by reference.

Frank E. Zorniger, Sr., and Mary A. Zorniger, husband and wife, resided in Wilmore, Ky., at the time they filed their petitions herein. For the taxable year 1966 petitioners each filed gift tax returns with the district director of internal revenue at Louisville, Ky. Petitioner Mary A. Zorniger filed her return only to consent to have the gift made by Frank E. Zorniger, Sr., considered as having been made one-half by her and to report such one-half as a gift taxable to her.

Petitioner Frank E. Zorniger, prior to December 1965, owned 1,340 shares of stock in Nelson Enterprises, Inc., an Illinois corporation which owned all of the stock of Tri-State Auto Rental Co. and Ray Bryant Chevrolet Co. Nelson Enterprises also owned other assets. The other shareholders of Nelson Enterprises were Harry L. Bell and H. Ray Bryant who owned 1,340 shares and 1,320 shares, respectively.

Ray Bryant Chevrolet was a retail dealer of Chevrolet automobiles in Dayton, Ohio, pursuant to a dealer selling agreement (agreement) with the Chevrolet Motor Division, General Motors Corp., covering the period November 1, 1965, through October 31, 1970. H. Ray Bryant was the operating manager [1] of the dealership and was responsible for its day-to-day operations. Petitioner Frank E. Zorniger, Sr., and Harry L. Bell participated in the operation of the dealership through periodic consultations with Bryant. During its existence, the dealership under Bryant, Bell, and Zorniger, Sr., was very successful and General Motors considered the three men to be excellent dealers.

In December 1965 both Bryant and Bell died. At that time the agreement could have been terminated by Chevrolet as a result of the deaths of two of the three dealer parties to the agreement, but pursuant to the option granted to him by the agreement, Mr. Zorniger, Sr., requested that the date of termination be deferred to December 23, 1966.[2] His request was approved by Chevrolet on January 20, 1966.

In March 1966 the shares of Bryant and Bell in Nelson Enterprises were redeemed at the then book value of $704.34 per share pursuant to a buy-sell agreement. After the redemption, petitioner Frank E. Zorniger became the sole shareholder of Nelson Enterprises. On May 31, 1966, Nelson Enterprises and Tri-State were merged into Ray Bryant Chevrolet and 3,000 shares (all of the outstanding stock) of the surviving corporation were issued to petitioner Frank E. Zorniger in

---

[1] An "operating participant" or "operating manager" is an individual with an ownership interest who actively participates in the management of the dealership.

[2] The portion of the agreement dealing with termination is reproduced in full, *infra.*

exchange for his shares of Nelson Enterprises. Immediately after the merger the financial status of Ray Bryant Chevrolet was as follows:

*Assets*

| | | |
|---|---:|---:|
| Current assets | $2,928,204.19 | |
| Fixed assets | 497,844.13 | |
| Other assets | 1,000.00 | |
| | | |
| Total assets | | $3,427,048.32 |

*Liabilities*

| | | |
|---|---:|---:|
| Current liabilities | 2,310,720.90 | |
| Deferred income | 106,468.84 | |
| Stockholders' equity | 1,009,858.58 | |
| | | |
| Total liabilities and equity | | 3,427,048.32 |

The Ray Bryant dealership for the years 1961 through 1966 earned net income and had stockholders' equity as follows:

| | Net income | Stockholders' equity |
|---|---:|---:|
| 1961 | $77,468.35 | $560,615.41 |
| 1962 | 165,511.80 | 726,127.21 |
| 1963 | 198,712.54 | 934,804.88 |
| 1964 | 222,295.25 | 1,159,358.60 |
| 1965 | 247,907.03 | 1,406,599.95 |
| 1966 (post merger) | 158,952.82 | 1,234,835.28 |

Prior to the deaths of Bryant and Bell, Ray Bryant Chevrolet was operating under a dealer selling agreement with General Motors which is summarized in part as follows:

(a) Each Agreement is a personal service contract entered into in reliance upon the personal qualifications of the persons named in paragraph Third thereof. Notwithstanding the form in which the dealership is cast (corporation, partnership, sole proprietorship, etc.), each participant must individually qualify under General Motor's standards and agree to be bound by the terms and conditions of the Agreement. Harry L. Bell, H. Ray Bryant and Petitioner Frank Zorniger, Sr., were named in the Agreement terminated on October 1, 1966.

(b) Each Agreement is entered into for a maximum term of five years at the end of which it will automatically terminate. The Agreement in force at the date of the deaths of Bryant and Bell began on November 1, 1965. That Agreement was terminated and another Agreement was entered into between the dealership and General Motors on October 1, 1966.

(c) Under the "Operating Requirements" section of the Agreement the Dealer agrees to the following:

(i) The Dealer cannot move or establish a new or different location for any aspect of the dealership without the prior written approval of Chevrolet;

(ii) The Dealer must meet certain minimum capital requirements which are established at the time of execution of the Agreement. If it becomes necessary to increase these requirements, the Dealer must increase within a specified period of time agreed upon by the parties;

(iii) The Dealer must use an accounting system prescribed by Chevrolet;

(iv) The Dealer agrees to submit to an examination of dealership records and accounts by Chevrolet at any reasonable time during regular business hours;

(v) The Dealer must provide satisfactory sales performance in his area based on composite standards for that area.

(d) If the Dealer does not comply with any of the above mentioned operating requirements, Chevrolet can terminate the Agreement effective three months after the receipt of the notice. In order to facilitate an orderly termination of business relations between Chevrolet and the Dealer and to facilitate any liquidation of the dealership business, Chevrolet will defer the effective date of any termination on the bases of death or incapacity and continue to operate with the Dealer for a period of not less than ninety (90) days and not more than one (1) year from the date of the death or incapacity. The Agreement will automatically terminate without further notice upon the expiration of any such continuation period. (The "Termination" portion of the Agreement is reproduced in full, *infra*.)

(e) The Dealer is not made the agent or legal representative of Chevrolet for any purpose whatsoever by the terms of the Agreement.

(f) The Dealer shall not transfer or assign or attempt to transfer or assign the Agreement or any right or obligation thereunder without the prior written consent of Chevrolet.

In 1966 petitioner Frank E. Zorniger resided in Wilmore, Ky., and had resided there during the time he was an owner of Ray Bryant Chevrolet. As a matter of policy Chevrolet required the operating manager of each dealership to reside in the city in which the dealership was located. In prior years H. Ray Bryant had served as the operating manager and had resided in Dayton, Ohio—the location of the dealership. Because of the age of Frank Zorniger, Sr., and his desire to remain in Wilmore, Ky., he decided to bring his son, Frank E. Zorniger, Jr., into the business as the resident operating manager. Because of his age and residence, petitioner Frank E. Zorniger would not have been approved by Chevrolet as the operating manager of Ray Bryant Chevrolet.

Frank E. Zorniger, Jr., had been in the automobile business on a full-time basis since 1950 and in 1966 was an operating participant of Superior Chevrolet Co., in Cincinnati, Ohio. He owned or had owned stock in the following automobile dealerships:

| Dealership | Period from | Mr. Zorniger's stock interest—percent |
|---|---|---|
| Superior Chevrolet Cincinnati, Ohio | [1] 1953 | 37½ |
| Winders Chevrolet Columbus, Ohio | [2] 1957 | 33½ |
| C. Bell Chevrolet Co. (formerly Ray Bryant Chevrolet) Grand Rapids, Mich | [2] 1959 | 37½ |
| Wessel Buick Co. Tulsa, Okla | 1961–63 | |

[1] Mr. Zorniger, Jr., was an "operating participant" until Oct. 1, 1966.
[2] Mr. Zorniger, Jr., was an "operating participant" until 1965.

The dealerships in which Mr. Zorniger, Jr., had participated were generally smaller than Ray Bryant Chevrolet and had different work-

ing capital requirements; however, all of them were profitable businesses.

Petitioner Frank E. Zorniger and his son applied on April 4, 1966, for a new dealer selling agreement between Ray Bryant Chevrolet and the Chevrolet Motor Division, General Motors Corp. The letter of transmittal addressed to J. H. Pike, Zone Manager, included the following:

(a) A proposal by the applicants to change the name of the dealership to "Frank Z. Chevrolet Company;"

(b) An indication that Mr. Zorniger, Sr., and Mr. Zorniger, Jr., were to own 70 percent and 30 percent respectively, of the company's stock;

(c) An intention to have both applicants named in Paragraph Third of the selling agreement and active in the dealership;

(d) A recognition that, since Frank E. Zorniger, Jr., was named in Paragraph Third of Superior Sales Chevrolet, he would have to dispose of his stock interest in that dealership. However, this was not to take place unless and until he was named in Paragraph Third of the proposed Ray Bryant Chevrolet Co. selling agreement.

The last provision was necessary because General Motors would not permit an individual to retain an operating interest in two dealerships, and Mr. Zorniger, Jr., did not want to dispose of his other dealership interests unless he was assured of the approval of the Ray Bryant dealership. On October 1, 1966, the Zornigers' application was approved for a dealership named "Ray Bryant Chevrolet Co." with:

(a) Mr. Zorniger, Sr. owning a 50 percent interest in the company, and being named as participating in ownership but not in the operation of the dealership; and

(b) Mr. Zorniger, Jr. owning a 50 percent interest in the company and being named as participating in ownership and operation of the dealership.

On October 1, 1966, Mr. Frank E. Zorniger, Sr., transferred to his son, Frank E. Zorniger, Jr., as a gift 860 shares of Ray Bryant Chevrolet stock and sold him an additional 640 shares of Ray Bryant Chevrolet stock for $223,360 or $349 per share. Mrs. Zorniger, Sr., consented to the gift of 860 shares being treated as having been made one-half by her.

Mr. and Mrs. Zorniger filed Federal gift tax returns and reported the gift of 860 shares at a value of $349 per share. The 640 shares sold to their son were not reported for gift tax purposes.

The value of $349 per share equals the net book value of the stock and considers no value for intangible assets such as goodwill. The fair market values of the physical assets of Ray Bryant Chevrolet were equal to their respective book values at the time of the gift and sale. After the sale and gift, Frank E. Zorniger, Jr., and Frank E. Zorniger, Sr., each owned 50 percent of the stock of Ray Bryant Chevrolet Co. (1,500 shares each).

The balance sheet of Ray Bryant Chevrolet Co. on September 30, 1966, was as follows:

ASSETS

Current assets:

| | | |
|---|---|---|
| Cash and contracts | $258, 976. 17 | |
| Receivables | 797, 661. 51 | |
| Inventories | 693, 402. 39 | |
| Discounts receivable | 117, 472. 20 | |
| Factory claims | 25, 517. 98 | |
| Prepaid expenses | 11, 396. 63 | |
| Total current assets | | $1, 904, 426. 88 |

Fixed assets:

| | | |
|---|---|---|
| Land | 218, 800. 37 | |
| Machine and shop equip | 30, 076. 81 | |
| Parts | 8, 108. 53 | |
| Furnishings | 25, 550. 90 | |
| Service units | 19, 679. 73 | |
| Lease and rental units | 22, 827. 43 | |
| Leaseholds | 154, 678. 13 | |
| Total fixed assets | 479, 721. 90 | |
| Miscellaneous deposits | 1, 010. 00 | |
| Total assets | | $2, 385, 158. 78 |

LIABILITIES AND STOCKHOLDERS' EQUITY

| | |
|---|---|
| Current liabilities | 1, 109, 782. 43 |
| Deferred finance charges | 79, 271. 59 |
| Mortgage payable | 149, 096. 20 |
| Total liabilities | 1, 338, 150. 22 |
| Stockholders' equity | 1, 047, 008. 56 |
| Total liabilities and net worth | 2, 385, 158. 78 |

On October 1, 1966, the Ray Bryant Chevrolet Co. Dealer Selling Agreement dated November 1, 1965, was terminated to permit the execution of a new Dealer Selling Agreement. On the same day, a new Dealer Selling Agreement expiring on October 31, 1970, was executed for Ray Bryant Chevrolet Co. (Dealer) by and between Frank E. Zorniger, Sr., Frank E. Zorniger, Jr., and the Chevrolet Motor Division of General Motors Corp. Petitioner Frank E. Zorniger was designated as a dealer-owner, and his son, Mr. Zorniger, Jr., was designated as a dealer-owner and dealer-operator. When Mr. Zorniger, Jr., acquired his interest in Ray Bryant Chevrolet, he simultaneously relinquished his interest in Superior Chevrolet Co. The gift and sale of the stock from Mr. Zorniger, Sr., to Mr. Zorniger, Jr., were not com-

pleted until the application to operate the Ray Bryant dealership was approved.

When Mr. Zorniger, Jr., assumed his duties as operating manager of Ray Bryant Chevrolet he began to operate substantially the same business as had been successfully operating prior to his involvement. Several of the department heads were replaced by persons from within and without the dealership. Ray Bryant had a reputation for courteous and honest business dealings which continued to flourish after Mr. Zorniger, Jr., took over the chief managerial post.

When Mr. Zorniger, Jr., disposed of his interests in the other automobile dealerships in order to qualify as an "operating participant" in Ray Bryant Chevrolet, he disposed of those interests at values equal to the net book values of the assets of these dealerships. It was the policy of General Motors in 1966 and prior thereto, not to approve the transfer of a dealership at a price in excess of the net fair market value of the physical assets. The standard form agreement utilized by General Motors did not explicitly state this policy. General Motors' ability to prohibit the inclusion of payments for goodwill in the purchase price of a dealership was limited to its approval or disapproval of the application for the new dealership.

The Dealer Selling Agreements in effect between Ray Bryant Chevrolet and the Chevrolet Motor Division prior and subsequent to October 1, 1966, included, by reference, a "general purpose agreement" which contained the following subparts: definitions and selling privilege, sales to dealer, operating requirements, termination of agreement, and general provisions. The portion of the document relating to terminations read as follows:

#### TERMINATION OF AGREEMENT

14. Termination

A. Termination by Dealer

Dealer may terminate this Agreement by written notice of termination delivered to Chevrolet, such termination to be effective one (1) month after receipt by Chevrolet of such notice.

B. Termination for Cause

(1) If Chevrolet or Dealer requires a license for the performance of any obligation under or in connection with this Agreement in any state or jurisdiction where this Agreement is to be performed, then and in such event if either of the parties shall fail to secure or maintain a license or renewal thereof or if such license shall be suspended or revoked, irrespective of the cause or reason therefor, either party may immediately terminate this Agreement by giving to the other party written notice of such termination.

(2) If Dealer does not conduct its business in accordance with any requirement set forth in Sections 6, 7, 8, 9A, 9B, or 10 of this Agreement, [3] Chevrolet may

---

[3] Pertains to operating requirements regarding dealer's place of business (sec. 6), capital requirements (sec. 7), accounts and records (sec. 8), sales performance (responsibility for sales—sec. 9A, and sales organization—sec. 9B), and service performance (sec. 10).

terminate this Agreement by giving to Dealer written notice of termination to be effective three (3) months after receipt of such notice.

(3) In the event of the death or incapacity (for reasons of health) of any person named in Paragraph THIRD hereof, Chevrolet may terminate this Agreement.

However, to facilitate an orderly termination of the business relationships between Chevrolet and Dealer and to facilitate any liquidation of the dealership business contemplated by Dealer, Chevrolet will defer the effective date of any such termination and will continue to operate with Dealer under the terms of this Agreement for a period, to be determined by Chevrolet, of not less than ninety (90) days and not more than one (1) year from the date of such death or incapacity if Chevrolet, within thirty (30) days from the date of such death or incapacity, receives a written request for such deferment * * *

     *      *      *      *      *      *      *

(4) Chevrolet may terminate this Agreement immediately by delivering to Dealer or its representative written notice of such termination in the event of the happening of any of the following:

(a) Removal, resignation, withdrawal or elimination from Dealer for any reason of any person named in Paragraph THIRD of this Agreement.

(b) Any attempted transfer or assignment of this Agreement or any transfer or assignment or attempted transfer or assignment of any right or obligation hereunder, unless the transfer or assignment of the right or obligation shall have been approved in writing by Chevrolet.

(c) Any misrepresentation to Chevrolet by Dealer or by any person named in Paragraph THIRD hereof in applying for this Selling Agreement or any misrepresentation to Chevrolet by Dealer or by any person named in Paragraph THIRD hereof as to the direct and/or indirect ownership or management of Dealer.

(d) Any sale, transfer, relinquishment, voluntary or involuntary, by operation of law or otherwise, of any interest in the direct or indirect ownership of Dealer or any transfer or relinquishment of or change in the active management of Dealer, without the prior written approval of Chevrolet.

(e) Any dispute, disagreement, or controversy between or among principals, partners, managers, officers or stockholders of Dealer which, in the opinion of Chevrolet, may adversely affect the ownership, operation, management, business or interest of Dealer or Chevrolet.

(f) Insolvency, of Dealer; filing of a voluntary petition in bankruptcy by Dealer; filing of a petition to have Dealer declared bankrupt, provided that it is not vacated within thirty (30) days from date of filing; appointment of a receiver or trustee for Dealer, provided such appointment is not vacated within thirty (30) days from the date of such appointment; execution by Dealer of an assignment for the benefit of creditors.

(g) Conviction of Dealer or any principal officer, principal stockholder or manager of Dealer or any partner in Dealer of any crime which, in the opinion of Chevrolet, may adversely affect the good will or interests of Dealer or Chevrolet.

(h) Failure of Dealer to maintain dealership operation as a going business, open during customary business hours, for seven consecutive business days, provided such failure is not due to causes beyond Dealer's control and is without Dealer's fault or negligence.

(i) Any submission by Dealer to Chevrolet of a false or fraudulent application, or claims or statements in support thereof, for reimbursement for warranty, special policy or campaign adjustments performed by Dealer, for parts wholesale compensation or for any other discount, allowance, refund or credit under any other Chevrolet program.

In his statutory notice of deficiency the Commissioner determined that the per share value for gift tax purposes should have included an amount for intangible goodwill in addition to the reported value based solely upon the net fair market values of the physical assets. The Commissioner determined in the statutory notice of deficiency that the value of the stock should have been $691.30 per share but reduced this amount at the time of trial to $500 per share. Because the petitioner sold 640 shares of stock to Mr. Zorniger, Jr., at $349 per share, the Commissioner determined the sale to be a "bargain sale" and included the difference $342.30 ($691.30–$349) per share times the shares sold (640) or $219,072 as a taxable gift of petitioners in 1966.

### ULTIMATE FINDING OF FACT

The fair market value of the 1,500 shares of Ray Bryant Chevrolet Co. stock received by Frank E. Zorniger, Jr., from petitioner Frank E. Zorniger on October 1, 1966, was $349 per share.

### OPINION

Petitioner Frank E. Zorniger, on October 1, 1966, transferred as a gift 860 shares of stock of Ray Bryant Chevrolet and on the same date sold to his son 640 shares of such stock for $349 per share. Petitioner Mary A. Zorniger consented to have one-half of the gift treated as having been made by her for gift tax purposes. Petitioners reported the gift of stock at a value of $349 per share, the price at which the 640 shares were sold.

The Commissioner, in his statutory notice of deficiency determined the fair market value of the stock on the date of the gift and sale to be $691.30 per share but at trial contended the value to be only $500 per share.

There is no dispute between the parties as to the fair market value of the physical assets of Ray Bryant Chevrolet. It is agreed that the fair market values equal the respective net book values.

The dispute centers around whether Ray Bryant Chevrolet, a retail automobile dealership, possessed goodwill which should be reflected in the valuation of its stock.

The value affects the sale of stock as well as the gift because the Commissioner, in his statutory notice of deficiency, determined that the

sale of 640 shares at a price of $349 was sold at a price less than its fair market value and the difference represented a taxable gift. Sec. 2512(b), I.R.C. 1954.[4]

We considered the question of goodwill in a General Motors dealership in *Floyd D. Akers*, 6 T.C. 693 (1946), acq. 1946–1 C.B. 1. In *Akers* the taxpayer acquired all of the outstanding stock of Capitol Cadillac Co. from the General Motors Holding Corp. (Holding Corp.), a division of General Motors. Capitol Cadillac Co. was operated under a nontransferable, personal service contract (agreement) between the taxpayer and General Motors. Although the terms of the agreement in *Akers* differed somewhat from the agreement in the instant case, they are essentially the same. The taxpayer in *Akers*, after acquiring all of the stock of the dealership, organized a partnership with his wife for the purpose of selling and servicing the automobiles covered by the agreement. The taxpayer liquidated the corporation and distributed the assets of the dealership to himself as the sole shareholder of the corporation. The Holding Corp. had assured the taxpayer that once he had acquired all of the stock of the dealership, they would approve a partnership franchise arrangement with the taxpayer and his wife as partners for the sale of the same automobiles sold by the corporation. During all times pertinent to the case in *Akers*, the dealership operated profitably and the name Capitol Cadillac was retained by the partnership which succeeded to the business.

The Commissioner took the position in *Akers* that an amount should be added by the taxpayer to his liquidation proceeds in order to reflect the intangible goodwill of the dealership. The taxpayer had reported the liquidation proceeds at the net book value of the assets. In holding that no transferable goodwill existed in the dealership corporation which was liquidated, we stated:

The corporation's right to conduct the business in which it was engaged was dependent upon franchises from the General Motors Corporation, and the franchises granted to it for the sale of Cadillac, LaSalle, and Oldsmobile cars in specified territory were subject to termination by the General Motors Corporation on 90 days notice, effective in July, August, and September in any year, without cause and without notice for specified causes. *The franchises were not assignable and by their terms were made personal contracts between the parties. Such good will or going-concern value as the corporation might have created during its existence was subject at all times to be divested by termination of the franchises without action by the corporation.* Termination of the franchises not only meant the loss of the right to receive new cars, parts, etc., under the agreements, but the right to use the words "Cadillac," "Olds," or "Oldsmobile" in the name of the

---

[4] SEC. 2512. VALUATION OF GIFTS.

(b) Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year.

corporation. These names and the good will attached thereto were specifically reserved to the General Motors Corporation in the franchise agreements, in which no provision was made for payments for good will or going-concern value in the event of their termination. Thus the good will, if any, was bound to the franchises and ceased as something out of which the corporation could use or derive profit when the franchises were terminated.

The fact that the General Motors Corporation had agreed in advance of the dissolution of the corporation to enter into new agreements with the partnership, when formed, does not alter the situation. *The good will, if any, continued to be embodied in the franchises and they, under the circumstances, were not property subject to transfer or other disposition by the corporation. Noyes-Buick Co. v. Nichols,* 14 Fed. (2d) 548. [Emphasis supplied. *Floyd D. Akers, supra* at 700.]

The rationale of our decision in *Akers* focuses upon the nature of the franchise agreement between the taxpayer-dealer and General Motors. In *Akers* we felt that no goodwill could exist in a nontransferable, personal service contract the privileges of which could be divested from the taxpayer under circumstances completely beyond his control. The Court of Claims holds likewise. *Rothgery* v. *United States,* 201 Ct. Cl. 183, 475 F. 2d 591 (1973). We agree with the court in *Noyes-Buick Co.* v. *Nichols,* 14 F. 2d 548 (D. Mass. 1926), wherein that court, in considering the goodwill existing in a Buick franchise, stated:

It is apparent that a very unusual situation was presented—a company doing an extensive business, based on its ability to obtain in large quantities and to sell exclusively through a populous territory a popular make of automobiles, the ability to obtain the cars and to hold the exclusive territory, resting on the personal relations between the owner of the selling company and the managers of the manufacturing company. Obviously the good will of such a business is dependent on the life of the owner of it, and on the continuance of the friendly feeling for him by the managers of the other company. With every regard for the Commissioner's determination, I cannot believe that any reasonable person would pay any substantial sum for good will, resting on such an insecure and precarious foundation.* * * [14 F. 2d at 549.]

Respondent attempts to distinguish *Akers* from the instant case because it involved proceeds upon liquidation rather than valuation of stock. This is a distinction without a difference. If the corporation has no goodwill which is transferable upon liquidation it can have none which will affect the value of its stock when the stock is transferred. The transfers of stock from petitioner Frank E. Zorniger to his son by gift and by sale would have been hollow gestures if Chevrolet had not approved a new dealership agreement.

We continue to believe *Akers* was correctly decided and apparently the Commissioner thought so when he acquiesced in that decision, which acquiescence has not been withdrawn.

Respondent offered testimony of an expert witness to support a valuation of $500 per share. Such testimony is not being disregarded

because of its quality but instead because the nature of the corporation's business reflected in its agreements with the Chevrolet Division precludes a finding of goodwill.

In view of our holding following *Floyd D. Akers, supra,* it is unnecessary for us to decide whether the burden of proof was shifted to respondent by reason of his valuation at trial varying from the valuation determined in his statutory notice of deficiency.

*Decisions will be entered for the petitioners.*