JOSEPH K. RUHLMAN and JEAN M. RUHLMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ruhlman v. Commissioner
Docket No. 9198-73
United States Tax Court
T.C. Memo 1976-81; 1976 Tax Ct. Memo LEXIS 325; 35 T.C.M. (CCH) 349; T.C.M. (RIA) 760081; March 16, 1976, Filed *325 Leonard J. Prekel, for the petitioners. Peter M. Ritteman, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent has determined deficiencies in petitioners' Federal income tax as follows: Taxable Year
Deficiency
1969
$5,562.98
1970
7,064.90
1971
4,939.55
The sole issue for decision is whether the payments made by petitioners in 1969, 1970 and 1971 represent part of the purchase price paid for the acquisition of physical assets or are payments for goodwill. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Joseph K. and Jean M. Ruhlman, [1] husband and wife, were residents of Ferndale, Michigan at the time the petition was filed in this case. They filed their joint income tax returns for the years in issue with the internal revenue service center in Covington, Kentucky. Petitioner was employed as a service station attendant at a service station located in Southfield, Michigan *326 from 1959 through 1963. From 1964 until March 31, 1969 he was employed as manager of this station. The station was owned by Citrin Oil Company (Citrin), a Michigan corporation and was under lease to James V. McMillan, petitioner's employer. McMillan operated the station from November 30, 1961 through August 7, 1968, the date of his death. The lease agreement in effect at the time of McMillan's death provided that the lease was nonassignable without the written consent of Citrin. The agreement further provided that the lease could be terminated by Citrin for a number of reasons, including the death of the tenant: [If] Tenant is an individual, in the event of his death during the term of this lease or any extension or renewal thereof, then and in any such event, the Landlord at any time thereafter shall have the right, at the Landlord's election, either with or without process of law, to enter upon the premises herein demised and take possession of the same, together with all buildings, machinery, equipment and appliances situated thereon, using such force as may be necessary to obtain the actual possession thereof, and such entry shall not be regarded as a trespass, nor be sued *327 for as such, nor be regarded as in any wise unlawful, and upon such entry this lease shall terminate and become void and of no effect and shall be forfeited, * * *. The lease agreement was accompanied by a dealer agreement pursuant to which Citrin agreed to supply the station operator with his requirements of gasoline and petroleum products. Under this agreement Citrin could sell any brand of gasoline it wished to the dealer. During 1968-1969 Citrin sold Standard Oil products. The dealer agreement was made "upon the express condition that the Company [Citrin] shall have and it does hereby expressly reserve the right to cancel and terminate this agreement or any renewal or extension thereof, at any time, upon giving at least ten (10) days' prior written notice thereof to the Dealer [McMillan]." The dealer agreement was also nonassignable. In addition to the sale of oil and gasoline products, the station operated two automobile service bays, and an automobile towing service, with at least two wreckers. Subject to some variation, the business profits were in general derived 25 percent from repairs, 25 percent from the towing service, and 50 percent from gasoline sales. The station *328 remained open 24 hours a day, except Christmas, and was located on a major highway. After McMillan's death, petitioner was contacted by William Gooding, a representative of Citrin, regarding the takeover of the service station's operation. On October 10, 1968 petitioner entered into a deposit agreement with Citrin reflecting petitioner's desire to lease the station. Citrin had originally proposed that petitioner just purchase the gas and oil inventory on hand, and drop the station's wrecking and repair operations. Petitioner, however, felt that the station could only be successful if operated on a full service basis. In order to acquire the equipment he needed, petitioner retained an attorney and opened negotiations with the McMillan estate for the purchase of its service station assets. These assets included two tow trucks, and station equipment for automobile service and repairs. Petitioner turned to the McMillan estate for the purchase of these assets primarily because his limited financial resources [2] made it difficult to purchase the needed assets on the open market. In addition, petitioner was well acquainted with the condition and the value of the station's tangible property. *329 During the period he was manager of the station, petitioner worked 7 days a week, 12 to 14 hours a day. Petitioner ran all phases of the service station, [3] including the hiring of the employees, the ordering of gas and oil products, and the purchasing of station equipment. Petitioner also assumed responsibility for the repair and maintenance of this equipment. Since the station conducted complete automobile service, it had a good deal of equipment on hand. Moreover, the station had extra equipment which it had brought over from another station previously operated by McMillan. Petitioner conscientiously kept this equipment in good condition. The tow trucks, for example, were outfitted with new motors in the spring of 1968. Petitioner estimated the value of this equipment to be approximately $35,000. [4]
*330 Negotiations between petitioner and McMillan's estate for the purchase of the station's assets had begun by early September 1968. [5] Dorothy McMillan, decedent's wife, had been advised by Citrin that it was terminating the lease pursuant to the terms of the lease agreement, and that it refused to enter into a lease with Mrs. McMillan, or a corporation formed by her. Citrin, however, continued to withhold any action under the lease clause permitting termination while the negotiations continued between McMillan's estate and petitioner. Since petitioner continued to manage the station during the period of negotiation, the continuity of the business was not disrupted. The negotiations for the purchase of the estate assets continued for several months after the initial meeting in September. On January 6, 1969 Citrin wrote to Mrs. McMillan to voice its dissatisfaction with the delay, again indicating its intent to terminate the lease. At least two offers made by the estate were rejected by petitioner. Finally, on April 2, 1969 a *331 sales agreement effective as of December 31, 1968, was executed between the McMillan estate and petitioner. On the same date, petitioner entered into a lease agreement with Citrin on substantially the same terms as his predecessor. Under the terms of the sales agreement, petitioner purchased all of the assets of the service business and all of the oil products inventory, pursuant to the following formula: a) Petitioner transferred to the estate a noninterest bearing note in the amount of $16,747.99, with a minimum monthly payment of $500. The amount of the note represented $12,362.46 for the oil products inventory, valued at cost, plus $4,385.53 for the book value of the remaining service station assets. Book value was computed using cost minus accumulated depreciation. b) Petitioner transferred to the estate another promissory note in the amount of $1,102.24 bearing interest at 6 percent per annum. The note was payable in minimum installments of $100 per month. c) Petitioner was obligated to make the additional payments described in paragraph 1(b) of the sales agreement: b) As compensation for the transfer of the leasehold interest of the ESTATE and by way of adjustment *332 of the difference between the book value of the inventory and equipment and the market value RUHLMAN shall pay in addition to the total sum represented in the foregoing paragraph an additional sum on an annual basis computed as of the year end commencing December 31, 1969, equal to twenty (20) per cent of the profit of the service station, said profit to be computed before any deduction is made therefrom for compensation paid to or withdrawals made by RUHLMAN as purchaser and operator of the service station and this annual percentage will be payable for a period of three (3) years commencing January 30, 1970, covering the calendar year of 1969 and terminating January 30, 1972. d) In the event the lease was terminated through no fault of petitioner or petitioner died then "upon the subsequent sale of the business and leasehold interest the estate or its assigns would receive for their interest a sum equal to twenty (20) per cent of the proceeds which might be received in excess of the then book value of the business." Although the contract exhibits some confusion in paragraph reference, it is clear this payment is in lieu of the remaining three annual payments covered by paragraph *333 1(b). Pursuant to the terms of paragraph 1(b), petitioner paid to Mrs. McMillan the following amounts: 1969
$14,801.04
1970
14,353.18
1971
10,650.88 These payments were deducted on petitioner's tax returns for the years 1969, 1970 and 1971 respectively. Petitioner now concedes that the deduction claimed for these amounts was improper, but argues that the payments represent the purchase price for the acquisition of physical assets. Respondent claims that the amounts paid to Mrs. McMillan for these years are payments for goodwill. Alternatively, respondent argues that these payments are a gift. OPINION The task presented this Court is to determine the nature of the payments made by petitioner to Mrs. McMillan during the years 1969, 1970 and 1971, in the amounts of $14,801.04, $14,353.18 and $10, 650.88, respectively. Respondent argues that these sums represent either payments in the nature of goodwill, or a gift to Mrs. McMillan. Petitioner, on the other hand, maintains that these payments represent part of the purchase price for the physical assets acquired from McMillan's estate. We agree with petitioner. At the outset, the record clearly shows that the *334 McMillan estate had no goodwill to sell. The lease agreement between Citrin and McMillan gave Citrin the option to terminate the lease in the event of McMillan's death. Shortly after McMillan died, Citrin contacted Mrs. McMillan, as executrix of the estate, to inform her the lease would be cancelled. At the same time, petitioner was contacted to discuss the takeover of the station. Citrin withheld action on the lease only because of and during the negotiations between petitioner and the McMillan estate over the sale of the station's tangible assets. The McMillan estate, therefore, did not have the power to continue the business as such, nor did it have the power to transfer a going business to petitioner. As a going business, the Southfield station's main elements of goodwill were first, its location, second, the patronage of its customers of a particular brand of gasoline, and third, customer satisfaction with the services provided. Since the location of the station was attributable to the lease, and the brand name sold to the station was determined by Citrin under the dealer agreement, both of these elements of goodwill were firmly controlled by Citrin. To the extent that any goodwill *335 or going concern value resided in these elements, the power to transfer them resided in Citrin and not McMillan. We note that in fact Citrin alone decided who would run the station, and that this decision was made without consulting the McMillan estate. Since any goodwill that attached to location and brand name was not the estate's to sell, we feel it inappropriate to allocate any part of the purchase price on this basis to goodwill. The third possible source of goodwill, customer satisfaction with the services provided, adds nothing to respondent's position. Undoubtedly, customer satisfaction with the way petitioner ran the station, including the skill and promptness with which repairs and other services were provided, were of some value. But this goodwill was associated primarily with petitioner's skills, and incidentally with location. Petitioner was under no obligation to refrain from capitalizing on his own skills and reputation at another location, and it is clear that the McMillan estate had no continuing rights to the existing location. If petitioner took the purchased assets to another location, it is also clear that no goodwill would follow on the basis of those assets *336 alone. In sum the McMillan estate had no goodwill to transfer or that petitioner would be willing to pay for. [6]
We believe the instant case to be analogous to our decisions holding that a franchisee of a nontransferable franchise terminable at will by the franchisor does not have transferable goodwill. Frank E. Zorniger,62 T.C. 435 (1974); Donal A. Carty,38 T.C. 46 (1962); Maurice A. Mittelman,7 T.C. 1162, 1169-1170 (1946); Floyd D. Akers,6 T.C. 693 (1946), acq. 1946-1 C.B. 1. In Zorniger, the taxpayer transferred by gift and sale stock in a corporation which operated a Chevrolet dealership. The agreement between the taxpayer-dealer and the Chevrolet Motor Division provided that the franchise was nonassignable without written consent. Furthermore, on the death of the dealer, Chevrolet had the right to terminate the dealership, but the dealer was allowed not less than 90 days *337 to liquidate. We held there that the value of the shares transferred should be determined by reference to the net fair market value of the tangible assets without any premium for goodwill. On similar facts we found no goodwill when a dealership was liquidated in Akers.
In those cases, like the present case, termination of the franchise or lease agreement [7] effectively terminated the business as well. In fact, the case against attributing goodwill to the transfer of assets here is even stronger than in the cases discussed above since the condition of termination had already occurred, and the lease was terminable by Citrin at will. Respondent relies on Baxter v. Commissioner,433 F.2d 757 (9th Cir. 1970), affg. a Memorandum Opinion of this Court in which we found goodwill where the business was operated under contracts terminable at will; Ralph A. Skilken,50 T.C. 902 (1968) affd. 420 F.2d 266 (6th Cir. 1969); *338 and Falstaff Beer, Inc.,37 T.C. 451 (1961), affd. 322 F.2d 744 (5th Cir. 1963). We find those cases to be inapposite. In each case, the seller of the business involved transferred to the buyer the opportunity to succeed to the seller's business clientele. No third party in those cases was involved in deciding who would take over the business. By contrast, the seller (McMillan's estate) here was powerless to convey any right to run the business in the future; this power was solely in the hands of a third party, namely Citrin. We also find the cases cited by respondent to have significant factual differences from the circumstances we confront. Finally, we believe that the purchase price substantially reflects the value of the physical assets so that there was no excess payment or premium that could be characterized as a payment for goodwill. The sales agreement between petitioner and McMillan's estate was the result of substantial negotiation. Pursuant to the agreement, petitioner transferred to the McMillan estate two promissory notes in the amount of $16,747.99 (noninterest-bearing) and $1,102.24 (interest at 6 percent per annum), respectively. In *339 addition, the sales agreement called for payments to the estate of 20 percent of the service station's profits for a 3-year period, computed before deducting petitioner's compensation. This contingent payment was described "as compensation for the transfer of the leasehold interest of the ESTATE and by way of adjustment of the difference between the the book value of the inventory and equipment and the market value * * *." [8]
It is clear from the facts previously recited that the estate had no leasehold interest. The book value of the equipment as of December 31, 1968, the effective date of the agreement was $4,385.53 computed on the basis of cost less accumulated depreciation. Much of the equipment had been fully depreciated and there was a wide disparity between book and market value. Moreover, the equipment was kept in excellent condition. *340 Petitioner, whose testimony was quite credible, estimated the value of the tangible assets to be $35,000. [9]
Even if the price paid for the assets was on the high side, [10] it must be noted that the inability of petitioner to put up any cash must certainly have increased his cost. Furthermore, when the contingent payment arrangement was made, neither party knew what the profits of the station would be. Weighing all these circumstances, we find the purchase price to be attributable to the physical assets acquired. *341 Respondent makes the alternative contention that the percentage of profit payments made to Mrs. McMillan represented a gift to her by petitioner. We can find no basis whatsoever of characterizing these payments as a gift. First, our finding that petitioner paid a fair price for the assets also determines the fact that there was no gift. We also note that the bargaining between Mrs. McMillan, as executrix and petitioner, was difficult and prolonged, hardly the context in which gifts are usually made. Moreover, there appeared to be no special relationship between petitioner and Mrs. McMillan which would suggest the possibility of a gift in an otherwise business context. See Commissioner v. Duberstein,363 U.S. 278 (1960). Finally, petitioner was in no financial condition to make substantial gifts to Mrs. McMillan. He had no noteworthy assets of his own, and was supporting his wife and six children. We must, therefore, reject respondent's alternative contention. Decision will be entered under Rule 155.
Footnotes
1. Since Jean M. Ruhlman is a party to this action solely by reason of her filing jointly with her husband, Joseph K. Ruhlman will be referred to as petitioner.↩
2. At the time of McMillan's death, petitioner was married and had six school-age children. His total earnings during the four years preceding McMillan's death were as follows: 1964
Approximately $ 8,300
1965
Approximately 11,000
1966
Approximately 16,250
1967
Approximately 19,000 Petitioner did not then own a home, had no stocks or bonds, had a very modest savings account, and drove a five-year old car. ↩
3. In the few years preceding his death, McMillan had no significant input into running the station. His health was failing and he visited the station only infrequently and for very short periods of time. ↩
4. Appraisers appointed by the probate court valued the assets of the service station at the date of death (August 7, 1968) at $60,000. The appraisal was "based upon the valuation of inventory, equipment, accounts receivable and cash on hand less adjustment for doubtful accounts receivable and accrued but unpaid obligations." There is nothing to indicate the cash on hand or accounts receivable on this date; since they may have varied greatly from the date of sale (December 31, 1968), the appraisal is of marginal assistance in the present controversy. It seems clear, however, that the appraisers placed no value on the lease since the report noted that the lease contained "a provision which automatically terminates the lease upon the death of the tenant."↩
5. McMillan's will appointed Dorothy A. McMillan, decedent's wife, as executrix of his estate and conferred upon her the power to sell the estate assets.↩
6. In this connection we note that petitioner apparently promptly began doing business as "Joe Ruhlman Standard Service," indicating that whatever goodwill for personal service existed was associated with his name.↩
7. Taken together, the lease and dealer agreements were not unlike a franchise agreement. Both the lease and dealer agreements were executed at the same time, and were part of a single comprehensive agreement which incorporated the terms of them both.↩
8. Additionally, paragraph 2 of the contract, providing an alternative payment in the event of sale after Mr. McMillan's death (or termination of the lease), provided solely↩ for a payment based on the difference between the book and market value of the business, and appears to recognize that the estate had no interest in the lease.
9. The appraiser's valuation of the $60,000 for service station assets included accounts receivable and cash on hand. The record does not reveal what these amounts were on August 7, 1968, the date of McMillan's death. The valuation report is therefore an uncertain guide to the true value of the estate's assets. We might also add that the best judge of the value of the service station's assets was petitioner himself.↩
10. And in this connection we note that paragraph (g) of the sales agreement required that Mrs. McMillan turn over to petitioner "any security deposit" she directly received as this was taken account of in the purchase. This apparently referred to the $2,500 lease deposit Mr. McMillan had made to Citrin in 1961. It may also have included other deposits.↩