General Insurance Agency, Inc. v. Commissioner. Helen R. Throckmorton v. Commissioner.
General Ins. Agency, Inc. v. Commissioner
Docket Nos. 4807-65, 5762-65.
United States Tax Court
T.C. Memo 1967-143; 1967 Tax Ct. Memo LEXIS 117; 26 T.C.M. (CCH) 656; T.C.M. (RIA) 67143; June 28, 1967
*117 One of the assets of an insurance business being transferred in a sales transaction was a 5-year covenant not to compete against the selling corporation or an assignee entered into between the selling corporation and its directors. One of the directors was the sole stockholder of the selling corporation. This covenant was not bargained for separately and no value was specifically ascribed to it in the sales contract. Insurance expirations were the most valuable assets transferred by the sale. Held: Although the agreement of purchase and sale was somewhat ambiguous, the covenant not to compete was at most only supplementary to the sale of an insurance business in a general sense. No portion of the purchase price is allocable to the covenant not to compete; the seller is entitled to overall capital gains treatment and the buyer is denied deductions for the amortizable cost of a covenant not to compete. Held, further: The sole stockholder of the selling corporation, upon the corporation's liquidation, must recognize as income a proportionate part of each year's payments received under the agreement of purchase and sale which proportion is deemed in excess of her basis in the assigned *118 contractual right. Louis H. Miller, Jr., 202 Mutual Bldg., Richmond, Va., for the petitioner in Docket No. 4807-65. Carl E. Davis and George R. Hinnant, for the petitioner in Docket No. 5762-65. Douglas O. Tice, Jr., for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: Docket No.
Petitioner
Year
Deficiency
4807-65
General Insurance Agency, Inc.
1960
$1,167.51
1961
2,216.45
1962
2,117.41
5762-65
Helen R. Throckmorton
1960
641.62
1961
1,261.53
1962
1,805.29
These cases were consolidated upon a motion by respondent and will be decided together. The following questions are presented for our decision: (1) Whether payments by *119 General Insurance Agency, Inc., to R. W. Throckmorton, Inc., and Helen R. Throckmorton were for the insurance business of R. W. Throckmorton, Inc., generally, or for a covenant not to compete. (2) If it is determined that the foregoing payments were not for a covenant not to compete, whether Helen R. Throckmorton is entitled to recover her basis in the sales contract before recognizing income attributable to the payments or whether she is required to include a proportionate part of each payment in income for the taxable years of receipt. Findings of Fact The stipulated facts which have been agreed to by all the parties are found accordingly and adopted as our findings. Petitioners General Insurance Agency, Inc., hereinafter referred to as General, and Helen R. Throckmorton, hereinafter referred to as Helen, both filed Federal income tax returns for the calendar years 1960, 1961 and 1962 with the district director of internal revenue at Richmond, Virginia. General is a Virginia corporation engaged in a general insurance business with its principal office, at the time of filing the petition herein, in Richmond, Virginia. Helen was a resident of Richmond, Virginia, at the time *120 her petition was filed. Helen's husband, R. W. Throckmorton, started an insurance agency in 1931. This business was incorporated in 1952 as R. W. Throckmorton, Incorporated, hereinafter referred to as Throckmorton, and dealt primarily with the sale of automobile, fire and casualty insurance from an office in Richmond, Virginia. W. A. Spott, hereinafter referred to as Spott, was a nephew and an associate of Helen's husband in the insurance business for approximately 13 years until November 1, 1958. Spott was vice president and office manager of Throckmorton, but this relationship was terminated in 1958 when he went to work for General and he was serving as General's office manager at the time of trial. After Spott left the employment of Throckmorton, Helen's husband became ill. A man named Nixon was hired to sell insurance for Throckmorton and to manage the office. Helen's husband died on December 8, 1959, and Nixon's employment with Throckmorton was terminated in February of 1960. Upon the death of her husband, Helen became the sole stockholder of Throckmorton. Almost immediately after R. W. Throckmorton's death, L. J. Duggan, president of General and a 50 percent stockholder *121 therein who had been a lifelong friend of the Throckmortons, contacted Helen to inquire about acquiring the Throckmorton insurance agency business. Thereafter with the authority of General, Spott was occasionally loaned to Helen following her husband's death to help straighten out the insurance activities of Throckmorton. Helen held the position of secretary for Throckmorton and also served as a parttime bookkeeper. Helen's main occupation, however, is that of a real estate broker. She is also licensed to sell insurance, but her activity in this area was limited to insurance on houses she sold as a result of her real estate brokerage business. Helen did not sell insurance for Throckmorton, nor did she possess the technical knowledge necessary to run an insurance business. Shortly after Nixon stopped working for Throckmorton in February of 1960, Helen discussed with Spott the possibility that he might take over the insurance business of Throckmorton by purchasing an interest therein. No final agreement between them was reached. Spott informed Duggan about Helen's offer and the possibility that he might leave his employment with General to manage Throckmorton. Duggan was anxious *122 to keep Spott as his employee and after discussing the matter with Spott, decided to approach Helen again as to the possibility of General's taking over the insurance business of Throckmorton. After several discussions among Helen, Duggan and others, an understanding was reached whereby General would purchase the insurance business of Throckmorton. The elements of the business to be sold at this preliminary stage were all assets and liabilities relating to the seller's insurance business and all books, records, files and related papers of the insurance business. Throckmorton's gross income from commissions was $21,496.60 in 1957, $22,372.51 in 1958 and $23,879.48 in 1959. In the insurance business, expirations, or dailies, are copies of the agency's insurance policies in force and contain information which enables the agency to attempt to renew the policies upon expiration. The expirations, which belong to the agency, are valuable since they are a source of potential income and are transferable. When the expirations are being transferred the selling price of an insurance business is customarily based on a computation of one and one-half times the gross annual commission or two *123 times the net annual commissions for initial bargaining purposes. After preliminary agreement as to the purchase had been reached, in which no mention of a covenant not to compete was made, Helen contacted her attorney in order to have him prepare the written agreement of purchase and sale. Up to the time Helen contacted her attorney no request had been made either by Duggan or by any of the other representatives of General concerning a covenant by her not to compete in the insurance business. Helen's lawyer thought that the tax consequences to her of her selling the business would be affected beneficially if a covenant not to compete was one of the assets of Throckmorton transferred by the sale. A separate agreement which was to become an integral part of the overall sales transaction was drafted at the sole initiative of Helen's lawyer. The covenant not to compete was in the form of an agreement between Throckmorton and its stockholders and directors in order to give substance to the hope that such a covenant would constitute transferable property of Throckmorton for tax purposes. The resulting agreement was in pertinent part as follows: THIS AGREEMENT made this 1st day of March, *124 1960, by and between HELEN R. THROCKMORTON, THELMA S. MYERS and WILLIAM A. SPOTT, JR., being all of the stockholders and directors of R. W. Throckmorton, Incorporated, hereinafter called Directors, parties of the first part, and R. W. THROCKMORTON, INCORPORATED, a Virginia Corporation, hereinafter called Corporation, party of the second part; WITNESSETH: WHEREAS, there has been a verbal agreement between Corporation and Directors, since Corporation was formed, that Directors would not compete with Corporation in any business in which it was engaged during the time parties of the first part were stockholders or directors of Corporation or for a period of five years after Directors cease to be stockholders or directors or with Corporation's assigns or successors for a period of five years after all or any part of the business of Corporation was sold or transferred; and WHEREAS, it is the desire of all parties to this Agreement that it be reduced to writing; NOW, THEREFORE, in consideration of the premises, of $5.00 in hand paid, receipt of which is acknowledged, and the mutual covenants herein contained, Directors do covenant and agree with Corporation that so long as they are *125 stockholders or directors of Corporation they will not compete with Corporation in any business in which it was or is engaged during the time they were or are stockholders or directors thereof, or for a period of five years after Directors cease to be stockholders or directors or with Corporation's assigns or successors for a period of five years after all or any part of the business of Corporation is sold or transferred, and they do covenant and acknowledge that this was and is a condition under which they became and remain as stockholders and/or directors of Corporation. No stock in Corporation shall hereafter be sold or transferred except subject to this agreement and the Secretary of Corporation is hereby directed to recall all outstanding stock certificates and note on them that transfer of stock is subject to the conditions of Stockholders Agreement of March 1, 1960. The election of Directors on and after this date shall be conditioned on their acceptance of the terms of this Agreement in writing and they shall not be directors until after this has been done. * * *
It was evidently necessary for a corporation to have three directors so Thelma S. Myers, who provided secretarial *126 services for Throckmorton and did not sell insurance, and Spott were made nominal directors along with Helen. Although the foregoing agreement was dated March 1, 1960, it was actually executed as part of the entire sales transaction by Throckmorton to General on March 25, 1960. Spott was employed by General at the time he was made a director of Throckmorton, and he had no knowledge of the appointment prior to the time the agreement was executed. The actual purchase and sale agreement provided in pertinent part as follows: THIS AGREEMENT made and entered into this 25th day of March, 1960, between R. W. THROCKMORTON, INCORPORATED, a Virginia Corporation, Seller, and GENERAL INSURANCE AGENCY, INCORPORATED, a Virginia Corporation, Buyer; WHEREAS, Buyer desires to buy, and Seller desires to sell to Buyer, all the assets, properties and business, except the hereinafter described items of Seller for a purchase price to be ascertained as set out in Paragraph number 10 and the assumption by Buyer of certain liabilities and obligations, all upon the terms and conditions hereinafter set forth; NOW, THEREFORE, it is mutually agreed, as follows: 1. On the terms and subject to the conditions *127 herein set forth, Seller hereby agrees to convey, transfer, assign and deliver to Buyer and Buyer agrees to acquire and accept as hereinafter provided all the assets, properties and business of Seller of every kind and description wherever located, including, without limitation, all property, tangible and intangible, accounts receivable, bank accounts, cash and securities, claims and rights under contracts of Seller and all books and records of Seller relating to its business, provided that Seller shall retain those rights, assets and properties reserved herein in Paragraphs numbered 3 and 4. 2. The assets and property to be conveyed, transferred, assigned and delivered to Buyer are as follows: (a) Cash and accounts receivable not over ninety days old, the total of which shall be equal to the accounts payable assumed under this Agreement. (b) All office furniture and equipment located at 3122 West Clay Street, Room 207. (c) The agreement of the Corporation with its Officers and stockholders not to compete with the Corporation or its successor or assigns for a period of five years. * * *
7. The closing under this Agreement shall take place as of the close of business *128 on March 31, 1960, at the office of Seller, in Richmond, Virginia. 8. At the closing the assets hereinabove mentioned shall be delivered to Buyer and Seller agrees that it will at any time and from time to time after the closing date, upon request of Buyer, do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be required in conformity with this agreement for the better assigning, transferring, granting, conveying, assuring and conforming to Buyer or for aiding and assisting in collecting and reducing to possession, any or all of the assets or property to be assigned to Buyer as provided herein and any or all obligations of Seller hereunder. 9. Seller agrees that it will not dissolve until six months after closing date but reserves the right to wind up its affairs at any time thereafter and to make plans for its complete dissolution and the distribution of all of its net assets within twelve months under and in accordance with Section 337 of the Internal Revenue Code and Buyer will make all payments thereafter *129 to stockholders at time of dissolution. During said six months after the closing date Seller will use its best efforts to obtain the consent of other parties to all contracts and agreements with Seller to continue said contracts and agreements with Buyer under the supervision and at the request of Buyer. 10. On the terms and subject to the conditions herein set forth, Buyer will pay to Seller on all renewals of policies now handled by Seller or which have been handled by Seller within twelve months prior to the date hereof, an amount equal to one-half of the commission which would be received by Buyer had such renewal been of the same kind and amount of coverage in force at the date of this agreement, or one-half of the commission actually received by Buyer, whichever shall be the lesser, for a period of four years and for such additional time not exceeding one more year, as may be required for said payments to equal the sum of $30,000. If the Seller has not received $30,000 at the end of the said fifth year, then Buyer will, within thirty days thereafter pay to Seller such amount as may be necessary to bring Seller's total receipts hereunder to $30,000. Commissions are earned when *130 policies are renewed but are to be adjusted by return commissions applicable by reason of any policy or policies being cancelled or premiums being uncollectible. Buyer will render Seller a statement by the 15th of each month for the preceding month with payment for the period covered by the statement. * * *
12. During the existence of this Agreement, Buyer covenants and agrees to use its best efforts to renew each and every policy now handled by Seller and each and every policy handled by Seller during the past twelve months to notify Seller whenever it thinks Seller can be of assistance in renewing any policy and to furnish Seller with a list of all policies not renewed during each month by the 15th day of the succeeding month with all information about the reason for not renewing known to Buyer. 13. From and after the closing date Seller will not engage in any business or other activity except as required by this Agreement and to complete the liquidation and dissolution of Seller. The purchase and sale agreement and the covenant not to compete were executed on the same date and were considered by the parties as part of the same transaction. After the closing the purchased *131 assets of Throckmorton, including its insurance expirations, were moved to General's office. The fair market value of the office furniture and equipment received by General in the transaction was $1,764.02. Throckmorton had adopted a plan of complete liquidation on March 1, 1960. Dissolution of Throckmorton occurred on October 31, 1960, with assets worth $2,440.02 being distributed to Helen in addition to the contractual right to receive subsequent payments from General under the purchase agreement. Helen, the sole stockholder of Throckmorton, was not a party to the purchase and sale agreement of March 25, 1960, between Throckmorton and General. Until the dissolution of Throckmorton, payments by General were paid to Throckmorton and these payments amounted to $4,269.43 in 1960. After Throckmorton's dissolution, payments were made to Helen as assignee of the agreement. Helen received payments of $207.73 in 1960, $7,397.80 in 1961 and $7,281.96 in 1962. All of these payments were paid and computed on the basis of General's renewal commissions realized on Throckmorton's former policies in accordance with the sales contract. General did not claim any deductions for amortizing the *132 alleged cost of the covenant not to compete in its return for the years in issue. It merely excluded from income earned from commissions the amounts paid to Throckmorton before its liquidation in 1960 and to Helen thereafter in the years before us. Helen did not include in her returns any of the payments made to her in her reported gross income for any year. In his notice of deficiency to General respondent determined that the amounts paid by General to Throckmorton and Helen should be restored to income and accordingly increased General's commission income by $4,477.16 for 1960, $7,397.80 for 1961 and $7,281.96 for 1962. In his deficiency notice to Helen respondent increased her income by the same amounts stating that the payments were for a covenant not to compete; alternatively if such are not held to be such payments respondent determined lesser deficiencies based upon including in income for each year the proportionate part of the payments that exceed the fair market value of the contract when it was assigned to Helen on October 31, 1960, upon Throckmorton's liquidation. Respondent made the following explanation of his alternative determination in the deficiency notice issued *133 to Helen: In the event it is determined that amounts received by you from General Insurance Agency, Inc., were not received as payment for a covenant not to compete, it is held, alternatively, that there are deficiencies in income tax for the years 1961 and 1962 of $224.00 and $304.40, respectively, and an overassessment of $38.55 for the year 1960, computed as follows: * * *
Then followed a detailed computation for each year based upon respondent's determination of the gain realized by Helen upon the distribution in liquidation of Throckmorton on October 31, 1960, and his further determination that the contract with General Insurance, which had a balance due of $25,730.57 on that date had a then present value of $20,884.16. Opinion General has taken the position that during the taxable years in issue all payments to Throckmorton and Helen over and above the $1,764.02 paid for Throckmorton's office furniture and equipment were for the amortizable covenant not to compete and accordingly should be deductible from its gross income. Helen contends that no portion of the payments received under the purchase and sale agreement were for a covenant not to compete. As reflected *134 in our findings, General did not claim any such deductions in its income tax returns but merely reported its commissions reduced by the amounts paid over to Throckmorton and Helen and in turn Helen did not include any of the payments in her gross income for the years in question. Respondent has taken a protective position in these consolidated cases by denying a deduction for any portion of General's payments under the purchase and sale agreement for the years 1960, 1961 and 1962 and by restoring the excluded payments to income; he has included the entire payments for these years in Helen's taxable income. Respondent also contends that if it is found that none of the payments received by Helen were for a covenant not to compete, Helen still realized taxable income in each year to the extent that a proportionate part of each payment exceeded the fair market value of the contract as of October 31, 1960, which was determined to be $20,884.16. The primary issue for decision is whether all amounts paid under the purchase and sale agreement during the years 1960, 1961 and 1962 over and above $1,764.02, which was the fair market value of Throckmorton's office furniture and equipment *135 at the time of the transfer, were for a covenant not to compete or for intangible assets of Throckmorton, particularly the insurance expirations. Respondent favors Helen's position that no amount of the consideration should be attributed to the covenant not to compete due to his view of the facts, but he does not discuss the issue at length on brief. General contends that under the express terms of the purchase and sale agreement, the covenant not to compete and the furniture and office equipment were the only assets transferred and that therefore all amounts exceeding the fair market value of the furniture and office equipment must have been for the covenant not to compete. In dealing with a case of this type, the essential question is whether the covenant not to compete was actually dealt with as a separate item in the transaction and, if so, how much was paid for it. Benjamin Levinson, 45 T.C. 380 (1966). Amounts paid for a covenant not to compete constitute ordinary income to the seller and an amortizable expense to the buyer. However, if such a covenant is not separately *136 bargained and accounted for and is merely incidental to the transfer of the overall business and a contributing element to the assets transferred, the seller will be entitled to treat the entire proceeds of the sale as capital gain but the buyer will get no deduction. Hamlin's Trust v. Commissioner, 209 F. 2d 761 (1954), affirming 19 T.C. 718 (1953); Lee Ruwitch, 22 T.C. 1053 (1954), acq. 1955-1 C.B. 6; Toledo Newspaper Co., 2 T.C. 794 (1943). The evidence is persuasive that the covenant not to compete was not bargained for as a separate element of the transaction by the purchase and sale agreement; it clearly was not separately accounted for. General's argument that it was only paying for Throckmorton's office furniture and equipment and the covenant not to compete is based on paragraph 2 of the agreement which lists the assets and property to be conveyed as being, after an offset of accounts receivable and accounts payable, the office furniture and equipment and the covenant not to compete. General reasons from a literal reading of paragraph 2 that only the specified assets are being transferred. We cannot *137 agree and the evidence of record does not support General's view. This approach clearly ignores not only the substance of the transaction as established by the evidence but also the other provisions of the agreement. For example, paragraph 1 of the agreement specifically conveys "all the assets, properties and business of Seller of every kind and description wherever located, including without limitation, all property, tangible and intangible, accounts receivable, bank accounts, cash and securities, claims and rights under contracts of Seller and all books and records of Seller relating to its business * * *" [Emphasis added.] The agreement in question cannot be praised as a model of clear and concise drafting, but we believe that it had the practical effect of transferring the entire Throckmorton business as the parties to the transaction obviously anticipated and as it was in fact acted upon by the parties The valuable expirations were effectively transferred under the agreement and it is interesting to note that the minimum consideration of $30,000 provided for by the contract was very close to 1-1/2 times Throckmorton's net annual commissions in prior years, a multiple commonly *138 used in valuing insurance businesses when expirations are being transferred. We cannot agree with General's contention that no part of the consideration was for the expirations or other intangible assets of Throckmorton. From the evidence of record it appears much more likely to us that no part of the consideration was for the covenant not to compete. Helen did not have the ability or technical skills to manage an insurance business; she was the secretary of the Throckmorton Corporation and worked for the business only as a part-time bookkeeper. Helen certainly did not pose a real competitive threat to General. This was obvious to Duggan, General's president and Helen's long-time friend who said to her right after her husband's death: "Peggy, you can't run the business. Why don't you sell it and enjoy living." The record makes it clear that Helen's threatened competition was nonexistent, and General knew it. It is also argued by General that the covenant had the important effect of making sure that Spott would remain an employee of General. The possibility that Spott might leave General's employment for Throckmorton was eliminated when Throckmorton's assets and going business were *139 acquired and it agreed to liquidate. Moreover, General admits on brief that the covenant would not have assured Spott's continued service for General. It seems apparent to us from the circumstances surrounding the transaction that the covenant not to compete could in no way be termed a key element of the transfer. We believe that the ambiguous form of the purchase and sale agreement was attributable to an unfounded fear on the part of Helen's lawyer about the tax consequences to her of the transaction. The parties did not substantively treat the covenant not to compete as separable from the other assets being transferred. The expirations were the most valuable assets involved and were undoubtedly of primary importance in negotiating the contract price to be paid Throckmorton. We have previously held that insurance expirations are capital assets and their sale results in capital gain or loss. George J. Aitken, 35 T.C. 227 (1960). The parties do not suggest that an allocation could be made between the expirations and the covenant not to compete, and indeed we would have no rational basis on which to do so even if we believed that part of the consideration was for the *140 covenant. Under the particular facts of this case, no value can be properly ascribed to the covenant not to compete and we therefore hold that the entire purchase price of Throckmorton is entitled to capital gain treatment in Helen's hands and that General should not be allowed a deduction for any portion of the amounts paid for the assets of Throckmorton. Respondent's determination as to General is sustained. Due to the foregoing holding, it becomes necessary for us to determine whether Helen is entitled to recover her basis in the contract of sale which was assigned to her upon Throckmorton's liquidation before recognizing income attributable to the payments received thereunder, or whether she is required, as respondent determined, to include a proportionate part of each payment in income for the taxable years of receipt as constituting an amount in excess of her basis, the fair market value of the sale contract as of October 31, 1960. The agreement of purchase and sale provided that the consideration would be onehalf of the commissions attributable to renewals of policies originally sold by Throckmorton over a 4-year period. However, if the amount paid during the 4-year period *141 was not a total of $30,000, payments based on the same formula would occur for not more than one extra year to bring the total receipts to $30,000. If necessary, a cash payment of the amount necessary to make the total consideration $30,000 was due within 30 days after the end of the extra year. Thus the contract provided a minimum guarantee of $30,000. Respondent calculated and determined the fair market value of the contract right at the time of Throckmorton's liquidation as $20,884.16. The minimum balance still payable under the contract at that time was $25,730.57. The fair market or discounted value of the contract at the time of liquidation became Helen's basis for the contract. Respondent determined that a portion of each payment received by Helen represented income and should have been so reported in the taxable years of receipt. The taxable portion of the total payments received in any one year was determined by multiplying the payments by the ratio of the amount of the discount for present value to the minimum balance remaining under the contract at the time of liquidation. Helen does not dispute the correctness of the foregoing calculation, but contends that her rights *142 under the contract were speculative due to the fact that General was not obligated to make fixed payments at specific times. She argues that she should therefore be allowed to recover her basis before recognizing income and recovery of basis had not yet occurred during the taxable years in question. No cases are cited in support of Helen's position, but she is apparently relying on the line of cases which stands for the proposition that where the investment in a contract is of such a speculative nature that the purchaser cannot be reasonably certain of ever recovering his cost the payments thereunder should be considered as a return of cost until the full amount of the cost has been recovered. Burnet v. Logan, 283 U.S. 404 (1931); Morton Lifton, 36 T.C. 909 (1961), affd. 317 F. 2d 234 (C.A. 4, 1963); Phillips v. Frank, 295 F. 2d 629 (C.A. 9, 1961). The facts of the instant case preclude the application of the doctrine applied in the aforementioned line of cases. A minimum total consideration of $30,000 was payable within a specified period of time, and there was no suggestion that General was a poor credit risk. A contractual *143 right cannot be termed speculative on the ground that the amount of payments in any one year was indefinite. Payments were to be made according to a formula set forth in the agreement, and there was a minimum total consideration. Such a situation is clearly distinguishable from the cases which allow a return of basis before requiring discount income to be recognized and thus Helen has failed to bring her situation under their protective wing. See Walter H. Potter, 44 T.C. 159 (1965). Helen has not convinced us that there was a risk involved or that there was strong possibility that General would not fulfill its obligations under the contract. She has not produced evidence sufficient to overcome the presumptive correctness of respondent's alternative determination. We hold, therefore, that Helen must recognize ordinary income in the proportionate amount of the payments received during the taxable years as determined by respondent in his alternative determination as set forth in the statutory notice. Decision will be entered for respondent in Docket No. 4807-65. Decision will be entered under Rule 50 in Docket No. 5762-65.