UNITED STATES TAX COURT HARDWARE PLUS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hardware Plus v. Commissioner
Docket No. 8690-92
United States Tax Court
T.C. Memo 1994-250; 1994 Tax Ct. Memo LEXIS 251; 67 T.C.M. (CCH) 3045; June 2, 1994, Filed *251 For petitioner: Arthur H. McQueen, Jr.
For Respondent: John W. Sheffield III. PATE
PATE
MEMORANDUM FINDINGS OF FACT AND OPINION PATE, Special Trial Judge: This case was assigned pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1]
Respondent determined deficiencies in petitioner's 1988 and 1989 Federal corporate income taxes of $ 589 and $ 7,598, respectively. The sole issue for our decision is whether certain payments petitioner made during those years were for the acquisition of an intangible lacking a determinable useful life or were compensation for a covenant not to compete with a useful life specified by contract. FINDINGS OF FACT Some of the facts have been stipulated, and they are so found. Petitioner filed timely corporate income tax returns for each of the years in issue. Hardware *252 Plus, Inc. [2] was incorporated in South Carolina. Its principal place of business was located in Greenville, South Carolina, at the time the petition was filed. Petitioner was organized in approximately April 1987 by Daryl Fisher (hereinafter Fisher), its president and majority shareholder. Before incorporating Hardware Plus, Fisher had worked for 2 years as a regional sales manager for David Allison Co., Inc., a manufacturer of, among other things, cabinet hardware and bath accessories. Before that, he worked for 14 years as national sales manager for National Lock Hardware, another hardware manufacturing company. From its inception, petitioner operated as a manufacturer's representative for a variety of hardware manufacturers. [3] Prior to September 30, 1988, Hardware Plus represented, among others, David Allison Co., Inc. (hereinafter *253 David Allison Co.), and DFT Lighting, Inc. (a.k.a. Diamond F Lighting), a division of the Genlyte Group (hereinafter Diamond F). At that time, petitioner operated exclusively in South Carolina and a portion of North Carolina. In an effort to expand its business, petitioner entered into a written agreement (hereinafter Agreement) with Lee Smith Sales, Inc., (hereinafter Lee Smith Sales) on September 29, 1988. It is the income tax effect of the payments made under this Agreement that is at issue in this case. Lee Smith Sales is a *254 corporation, organized in North Carolina in 1973, which also operated as a manufacturer's representative. Lee Smith (hereinafter Smith) was its president and sole shareholder. Smith, Smith's wife, and James Roberts (hereinafter Roberts) were its only employees. Prior to September 30, 1988, Lee Smith Sales had contracts to represent, among others, Diamond F, David Allison Co., Ampcor, a division of Enamel Products & Plating Company (hereinafter Ampcor), Solar Hardware Company, another division of Enamel Products & Plating Company (hereinafter Solar Hardware), and Roc-Edge, Inc. (hereinafter Roc-Edge) (hereinafter collectively referred to as the Manufacturers). Under those contracts, Lee Smith Sales represented the Manufacturers in Virginia and in central and eastern North Carolina (hereinafter the Territory). The five major product lines sold by Lee Smith Sales (hereinafter Product Lines) were produced by the Manufacturers and included building materials, hardware, and lighting fixtures. None of the contracts Lee Smith Sales had with the Manufacturers were assignable and all of them could be terminated without cause by either party upon 30 days' notice. Fisher had met Smith and *255 Roberts sometime before April 1987 while serving as regional sales manager for the David Allison Co. After Fisher formed Hardware Plus, he and Roberts occasionally encountered one another while they were calling on customers. Sometime during 1988, Fisher met with Roberts to discuss the possibility of their joining together in an attempt to expand the territory in which they represented the Manufacturers. Around that time, Smith decided to reduce his activities because of personal problems caused by his and his family's poor health. However, both Smith and Lee Smith Sales continued to operate after the Agreement became effective, representing other manufacturers with which they had contracted. By 1988, Smith, and then Lee Smith Sales, had represented Diamond F and David Allison Co. for over 20 years. In addition, prior to 1968, Smith had represented Diamond F and David Allison Co. in his capacity as an employee of another manufacturer's representative. After discussions extending over several weeks, Smith agreed to help Fisher acquire contracts with the Manufacturers for Hardware Plus. As a result of their discussions, on or about September 1, 1988, Smith notified the Manufacturers *256 that Lee Smith Sales was terminating its contracts with them as of October 1, 1988. [4] At the same time, Smith encouraged the Manufacturers to assign the Product Lines to Hardware Plus. By letter dated September 20, 1988, Diamond F granted Hardware Plus a territory consisting of South Carolina, North Carolina, and portions of Virginia. By letters dated September 23, September 26, and September 27, 1988, Hardware Plus was appointed a manufacturer's representative for Ampcor, Roc-Edge, and David Allison Co., respectively, for South Carolina, North Carolina, and Virginia. Hardware Plus was also appointed as manufacturer's representative for Solar Hardware. [5] All the appointments were effective October 1, 1988. *257 The Agreement signed by Hardware Plus and Lee Smith Sales was dated September 29, 1988, and provided, in part: (1) LEE SMITH SALES, INC. hereby agrees to transfer to * * * [HARDWARE PLUS] its right to represent the following entities wherever that entity may be located. Existing customers are set forth as follows: (a) Diamond F Lighting (Exhibit A to be furnished by manufacturer) (b) David Allison Company (Exhibit B to be furnished by manufacturer) (c) Ampcor (Anderson Metal Products) (Exhibit C to be furnished by manufacturer) (d) Solar Hardware (Exhibit D to be furnished by manufacturer) (e) Roc-Edge Manufacturing (Exhibit E to be furnished by manufacturer)
* * * (2) * * * [HARDWARE PLUS] agrees to pay to LEE SMITH SALES, INC. the following: (a) Initial payment of Twenty Thousand Dollars ($ 20,000.00) on or before October 1, 1988, and a payment of Five Thousand Dollars ($ 5,000.00) on December 1, 1993. (b) A percentage of net commissions from existing customers set forth in Paragraph 1 above as follows: first year -- 23%, second year -- 20%, third year -- 17%, fourth year -- 14%, fifth year -- 11%. Should * * * [HARDWARE PLUS], during the *258 term of this Agreement, no longer serve as representative of any or all of the five companies listed in Paragraph (1) for the following reasons: (1) Resignation by * * * [HARDWARE PLUS] as representative of any or all of such companies; (2) Dissolution, liquidation, or other cessation of doing business by * * * [HARDWARE PLUS]; (3) Refusal of * * * [HARDWARE PLUS], to provide representation of any or all of the five companies in the same or similar manner, or to the same or similar extent, as is now provided by LEE SMITH SALES, INC.;
then * * * [HARDWARE PLUS] shall pay to LEE SMITH SALES, INC. for each company for which * * * [HARDWARE PLUS], no longer serves as representative, an amount equal to one-half (1/2) of the net commissions paid * * * by each such company to Lee Smith Sales, Inc. during the fiscal year of July 1, 1987 through June 30, 1988, less a credit against such amount allowable to * * * [HARDWARE PLUS], in an amount equal to the sum of (1) the net commissions paid to LEE SMITH SALES, INC. during the term of the Agreement for sales to each such company for which * * * [HARDWARE PLUS] no longer serves as representative and (2) an amount equal to the initial *259 payment of Twenty Thousand Dollars ($ 20,000.00) multiplied by a fraction, the numerator of which is the amount of net commissions paid to LEE SMITH SALES, INC. during the fiscal term July 1, 1987 through June 30, 1988, by such company for which the credit allowable to * * * [HARDWARE PLUS] is being calculated, and the denominator of which is the total net commission paid to LEE SMITH SALES, INC. during the fiscal term July 1, 1987 through June 30, 1988, by all five companies listed in Paragraph 1. * * * (c) LEE SMITH SALES, INC. shall not be entitled to commissions on any new customers or any customers other than those set forth in Paragraph (1) above. * * *
* * * (3) LEE SMITH SALES, INC. agrees to assist * * * [HARDWARE PLUS] with any technical information, sales tips, background information pertaining to customers which * * * [HARDWARE PLUS] may desire or request from LEE SMITH SALES, INC.
(4) It is understood by both parties that LEE SMITH SALES, INC. and LEE SMITH, individually, do not have an exclusive right to represent the manufacturers referred to herein, and therefore, LEE SMITH SALES, INC. and LEE SMITH are receiving the compensation set forth herein as *260 payment for the covenant not to compete. The death or disability of LEE SMITH shall not relieve * * * [HARDWARE PLUS] of its obligation to make those payments to LEE SMITH SALES, INC. outlines in Paragraph (2) of this Agreement. LEE SMITH SALES, INC. and LEE SMITH, individually, agree not to complete [sic] with * * * [HARDWARE PLUS] by attempting to represent any of the manufacturers referred to herein or any other manufacturers whose products or lines are represented by * * * [HARDWARE PLUS] during the existence of this Agreement and for the period of one (1) year after this Agreement has terminated. This restriction shall be valid in the territorial area which LEE SMITH SALES, INC. has been representing the manufacturers referred to herein. Provided, however, that if * * * [HARDWARE PLUS], is terminated by any or all of the five companies listed in paragraph (1) of this Agreement as its, or their, representative for whatever reason, then, notwithstanding the provisions of this Paragraph, LEE SMITH SALES, INC. and/or LEE SMITH may renew representation of any or all of the five companies listed in Paragraph (1) of this Agreement that have so terminated * * * [HARDWARE PLUS].
*261 Hardware Plus received the customer lists directly from the Manufacturers after it entered into the Agreement. [6] Afterward, Smith provided detailed information about each of the customers to help ensure a smooth transition. Concurrently, Lee Smith Sales and Hardware Plus entered into a Services Agreement under which Lee Smith Sales agreed to set up and maintain displays, and solicit orders, on Hardware Plus' behalf for three customers of Diamond F and one customer of David Allison Co. As consideration therefor, Hardware Plus agreed to pay Lee Smith Sales 22 percent of the net commissions generated by the accounts so serviced. Hardware Plus deducted the payments it made under the Services Agreement as commissions and such deductions were allowed by respondent on audit. Consequently, *262 the deductibility of those commissions is not in issue in this case. Hardware Plus did not purchase Lee Smith Sales' entire business, nor did it purchase any tangible assets from Lee Smith Sales. Hardware Plus also did not purchase the right to use the name "Lee Smith Sales". At no time did Smith advise the Manufacturers that Lee Smith Sales would receive a portion of the commissions paid to Hardware Plus. Lee Smith Sales continued to sell non-competing products for other manufacturers in the Territory during the entire period in issue. On October 1, 1988, Roberts went to work for Hardware Plus. He subsequently became its vice president. He acquired 49 percent of Hardware Plus' stock; thereafter Fisher owned the remaining 51 percent. During the audit of petitioner's 1988 and 1989 corporate income tax returns, Fisher and Roberts signed a document entitled "Consent Action for the Board of Directors of NuLoc Hardware, Inc. D/B/A Hardware Plus" (hereinafter Consent Action), and made effective October 3, 1988, which stated as follows: The undersigned, being all of the directors of the corporation hereby consent to the following: That the President of the corporation is authorized *263 to negotiate and conclude an agreement to acquire the customers and factories currently represented in North Carolina and Virginia by Lee Smith Sales, Inc.
At the time of trial, Hardware Plus still represented Ampcor and Solar Hardware, both of which were then called the Solar Group. However, Hardware Plus did not represent the other Manufacturers at that time because, prior thereto, Roc-Edge had filed a petition for reorganization under chapter 11 of the Bankruptcy Code; Diamond F terminated its contract on October 20, 1993, because it believed that Hardware Plus was representing a competitor; and David Allison Co. terminated its contract because it decided to employ its own sales force. On its 1988 and 1989 income tax returns, petitioner amortized over a 5-year period the $ 20,000 it paid Lee Smith Sales (deducting $ 1,000 and $ 4,000, in 1988 and 1989 respectively). Respondent disallowed the amortization deductions on the ground that it was not possible to ascertain what portion of the $ 20,000 was allocable to goodwill and what portion was attributable to the covenant not to compete. Petitioner also deducted $ 2,931 and $ 38,406 for 1988 and 1989, respectively, as commissions *264 paid to Lee Smith Sales. Respondent disallowed the deductions for commissions on the ground that the payments were made for the transfer of contracts and goodwill and such costs were not amortizable. OPINION Petitioner contends that goodwill is not involved in this case because Lee Smith Sales did not transfer any assets, tangible or intangible, to Hardware Plus. Rather, petitioner argues that Lee Smith Sales promised not to compete with petitioner for a limited period of time in the Territory, thereby granting petitioner the opportunity to prove its capabilities to the Manufacturers. Respondent contends that, under the Agreement, petitioner purchased more than a covenant not to compete; it purchased a bundle of assets including the relationships that Lee Smith Sales had built up with the Manufacturers over many years. Respondent argues that those assets form a customer-based intangible in the nature of goodwill, which has an indefinite useful life and, thus, is not amortizable under section 167(a). Resolution of the issue is a question of fact. Newark Morning Ledger Co. v. United States, 507 U.S.    ,    , 113 S. Ct. 1670, 1678, 1680 (1993); *265 Houston Chronicle Pub. Co. v. United States, 481 F.2d 1240, 1245-1251 (5th Cir. 1973). Petitioners bear the burden of proving that respondent's determinations in the notice of deficiency are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Deductions are a matter of legislative grace, with the taxpayer bearing the burden of proving the right to any deduction claimed. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Section 167(a) generally permits the amortization of the cost of intangible assets over their useful lives. Citizens & Southern Corp. v. Commissioner, 91 T.C. 463, 479 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990). Recently, the Supreme Court confirmed that an intangible asset shown to have "an ascertainable value and a limited useful life, the duration of which can be ascertained with reasonable accuracy," is amortizable under section 167(a) regardless of its relationship to the classic concept of goodwill as "the expectancy of continued patronage". Newark Morning *266 Ledger Co. v. United States, 507 U.S. at    , 113 S. Ct. at 1675, 1676 n.9, 1681-1683; see Ithaca Indus., Inc. v. Commissioner, 17 F.3d 684, 687-688 (4th Cir. 1994), affg. 97 T.C. 253 (1991); Meredith Corp. & Subs. v. Commissioner, 102 T.C.    ,     (1994) (slip op. at 83). In discussing the types of intangibles that have limited useful lives, the Supreme Court observed that Covenants not to compete, leaseholds, and life estates, for example, are depreciable over their useful lives that are expressly limited by contract. [Newark Morning Ledger Co. v. United States, 507 U.S. at    , 113 S. Ct. at 1676.]
Further, we have consistently held that a covenant not to compete is an intangible asset that has a limited useful life and, therefore, is amortizable over the course of such period. Warsaw Photographic Associates v. Commissioner, 84 T.C. 21, 48 (1985) (citing United Finance & Thrift Corp. v. Commissioner, 31 T.C. 278, 285-286 (1958), affd. 282 F.2d 919 (4th Cir. 1960)); O'Dell & Co. v. Commissioner, 61 T.C. 461, 467 (1974). *267 On the other hand, historically, goodwill is the aggregate value of the relationships and reputation developed by a business with its present and potential customers and associates over a period of time. It has been described as "the expectancy of continued patronage". Newark Morning Ledger Co. v. United States, 506 U.S.   , 113 S. Ct. at 1675 (quoting Boe v. Commissioner, 307 F.2d 339, 343 (9th Cir. 1962), affg. 35 T.C. 720 (1961)). However, because goodwill is considered not to have a limited useful life, no amortization deductions are allowable. Ithaca Indus., Inc. v. Commissioner, 97 T.C. at 262 (1991); Sec. 1.167(a)-3, Income Tax Regs.
Because of the differing tax treatments between a covenant not to compete and goodwill, there has been a great deal of litigation over whether the amount of purchase price allocated to the covenant not to compete reflected business reality or whether such amount was artificially allocated to such covenant solely for tax purposes. See, e.g., Throndson v. Commissioner, 457 F.2d 1022, 1024 n.2 (9th Cir. 1972), affg. *268 Schmitz v. Commissioner, 51 T.C. 306 (1968); Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965); Ullman v. Commissioner, 264 F.2d 305, 307-308 (2d Cir. 1959), affg. 29 T.C. 129 (1957); Major v. Commissioner, 76 T.C. 239 (1981). Using the reasoning set down in these and similar cases, and based on the record in this case, we conclude that the entire amount of consideration provided under the Agreement, that is, the $ 20,000 initial payment, the $ 5,000 final payment, and the percentage of commissions to be paid over the 5-year period, was consideration for the covenant not to compete.[7]
We base our decision, first, on the fact that the contract expressly provided that LEE SMITH SALES, INC. and LEE SMITH, individually, do not *269 have an exclusive right to represent the manufacturers referred to herein, and therefore, LEE SMITH SALES, INC. and LEE SMITH are receiving the compensation set forth herein as payment for the covenant not to compete. The death or disability of LEE SMITH shall not relieve * * * [HARDWARE PLUS] of its obligation to make those payments to LEE SMITH SALES, INC. outlined in paragraph (2) of this Agreement.
Both Fisher and Smith, who negotiated and executed the Agreement, were astute businessmen and knowledgeable in the business of representing hardware manufacturers. We have no reason to doubt that the language in the Agreement did not represent their true intention or reflect the business reality of this transaction. O'Dell & Co. v. Commissioner, supra at 468. Although, ostensibly, some of the consideration could be considered as allocable to what could be characterized as services (i.e., Lee Smith Sales' cancellation of its contracts with the Manufacturers and its promotion of Hardware Plus to the Manufacturers) a closer look at the transaction reveals that everything Lee Smith Sales was obligated, or had an incentive, to do under the Agreement *270 was part and parcel of the covenant not to compete. If Lee Smith Sales had not cancelled its contracts, or lobbied the Manufacturers to contract with Hardware Plus, the covenant not to compete with Hardware Plus would have been worthless. Moreover, on the flip side, without the covenant not to compete, the mere resignation of Lee Smith Sales and promotion of Hardware Plus would have been close to worthless inasmuch Lee Smith Sales could re-enter the market at any time. Thus, each component of the Agreement was mutually dependent on the other. At the time the Agreement was consummated, Smith had worked for the Manufacturers for a long period of time. Respondent argues that the expectancy of a long-term relationship with the Manufacturers was transferred to petitioner, which respondent characterizes as an intangible that does not have a limited useful life. However, Smith's relationships with the Manufacturers were personal to him; he had satisfactorily sold their products over many years and built up a track record. Despite Smith's recommendations, the Manufacturers did not know whether petitioner would be able to do as well. Therefore, under these circumstances, the intangible *271 which respondent argues was transferred, the expectancy of continued patronage, could not have been transferred to anyone, including petitioner, by Smith's words. In order for petitioner to build up the necessary relationships with the Manufacturers in the Territory, it needed time to prove itself without competition from Smith and it was prepared to pay Lee Smith Sales to gain this necessary time. Thus, the covenant not to compete was the thing of value for which petitioner paid Lee Smith Sales. Finally, the lump sum payments and formula for computing the percentage of commissions provided in the Agreement were in amounts that were reasonable to compensate Lee Smith Sales for its covenant not to compete in the Territory. Moreover, the fact that Lee Smith Sales would receive a percentage of petitioner's commissions rather than an amount fixed by the contract, provided Lee Smith Sales with an economic incentive to abide by the covenant not to compete inasmuch as its total compensation under the Agreement would be maximized in so doing. The case before us is factually distinguishable from General Ins. Agency, Inc. v. Commissioner, 401 F.2d 324 (4th Cir. 1968), *272 affg. T.C. Memo. 1967-143, where the wife of an insurance agent sold her husband's business after his death. Although she agreed not to compete as part of the sale, she had no experience in operating an insurance agency and therefore posed no threat to the purchaser. Moreover, the parties entered into the covenant not to compete because the wife's attorney suggested it for tax reasons. Consequently, the Court of Appeals for the Fourth Circuit found that "the parties attributed no value to the covenant not to compete", and it was "clear that the agreement not to compete had no economic value". Id. at 329. In contrast, Smith continued to represent other manufacturers after the Agreement became effective. Therefore, without the covenant not to compete, Smith posed a real threat to the survival of Hardware Plus as a manufacturer's representative in the Territory. Thus, the parties' allocation of the consideration to the covenant not to compete was commensurate with economic reality. Nevertheless, respondent, relying heavily on the Supreme Court's decision in Newark Morning Ledger Co. v. United States, supra, argues *273 that none of the amounts petitioner claimed as amortization allowances were deductible because, in canceling its contracts with the Manufacturers and agreeing not to compete with Hardware Plus, Lee Smith Sales effectively transferred to Hardware Plus a customer-based intangible with an indefinite useful life. The premise of respondent's position is twofold: (1) that the relationship between Lee Smith Sales and the Manufacturers and their customers constitutes a nonamortizable "mass asset" which Lee Smith Sales transferred to Hardware Plus by means of the Agreement, and (2) that petitioner has not proven that a covenant not to compete having a definite useful life had significance independent of this intangible. [8]
In considering respondent's argument, we first note that the Agreement provided that LEE SMITH SALES, INC. hereby agrees to transfer *274 to * * * [HARDWARE PLUS] its right to represent the * * * [Manufacturers] wherever that entity may be located.
Although this language purports to transfer to Hardware Plus the right to represent the Manufacturers in the Territory, such right was not transferrable. Rather, the contracts between Lee Smith Sales and the Manufacturers were not assignable and were terminable at will upon 30 days' notice. The Manufacturers had no obligation to do business with either Lee Smith Sales or Hardware Plus despite the purported transfer of "rights" under the Agreement. One cannot sell that which one does not own, and Lee Smith Sales had no ownership interest to transfer to Hardware Plus. Nor do we believe that the list of Manufacturers in the Agreement constitutes a customer-based intangible, as respondent argues. At best, petitioner acquired a list of five manufacturers, who were well known hardware manufacturers with which it and Fisher had done business in the past. The list itself had no value to petitioner; petitioner knew the names of the Manufacturers in advance of negotiating the Agreement. The only thing petitioner paid for was Lee Smith Sales' and Lee Smith's covenant not *275 to compete with it for a fixed period of time in the Territory as to those Manufacturers named in the Agreement. [9] The names listed in paragraph 1 of the Agreement thus are not a customer list per se, but parameters of the Agreement. That is, the Agreement provides that Lee Smith Sales would not compete with petitioner for a fixed period of time in the Territory, but only as to the named Manufacturers. Moreover, the fact that the payments would continue after death is immaterial in the context of the economic reality involved herein. See Wager v. Commissioner, 52 T.C. 416, 419 (1969); Levinson v. Commissioner, 45 T.C. 380, 391 (1966). Finally, we find that petitioner did not acquire a self-regenerating asset. Describing the mass asset rule, the U.S. Court of Appeals for the Fourth Circuit pointed out in Ithaca Indus., Inc. v. Commissioner, 17 F.3d 684, 688 (4th Cir. 1994), *276 affg. 97 T.C. 253 (1991), that As the [Supreme] Court suggested in Newark Morning Ledger, * * *, the distinguishing feature of a true mass asset is its ability to be regenerated without substantial effort on the part of its owner, that is, the ability to "self-regenerate". * * * [Fn. ref. omitted.]
What petitioner acquired was the opportunity to personally render services to five manufacturers in a limited territory. In order to maintain this base of manufacturers, petitioner had to put forth substantial efforts to show the Manufacturers that it could effectively sell their products to their customers. If the Manufacturers terminated their contracts with petitioner, as some of them did, they were not automatically replaced. Rather, if Hardware Plus wanted to add other manufacturers to supplement its representation or to replace a cancelled contract, it would have had to either directly solicit new manufacturers or enter into other agreements (similar to the one at issue) with other existing manufacturer's representatives. Consequently, we conclude that petitioner did not acquire a self-regenerating asset as contended by respondent. Lastly, *277 respondent argues that petitioner did not prove that it paid for an intangible that had a limited useful life. However, it is abundantly clear from the record that the amounts petitioner was obligated to pay pursuant to the Agreement precluded Lee Smith Sales from competing with it for a fixed period of time. [10] Accordingly, we hold that 5 years is the proper amortization period. Finally, we agree that petitioner's accounting method for deducting the amounts paid under the Agreement was proper. For the lump sum portion of the payment, petitioner amortized the payment on a straight-line basis. As to that portion of the payments which were to be determined as a percentage of the net commissions earned by petitioner from its representation of the Manufacturers, the amount *278 could only be determined as the net commissions were earned. Because the amount was not determinable in advance, petitioner deducted the entire amount it paid during the year under that portion of the Agreement. Under similar circumstances, where the amount was calculated on the basis of a percentage of income or of sales, we have permitted a method of amortization whereby the amount allowable each year equaled the payments made in such year because that method of accounting most clearly reflected income. See Associated Patentees, Inc. v. Commissioner, 4 T.C. 979 (1945); Holden Fuel Oil Co. v. Commissioner, T.C. Memo. 1972-45, affd. 479 F.2d 613 (6th Cir. 1973). Applying that theory here, the allowable amortization deduction for each year for the portion of the percentage-of-net-commissions payment would equal the amount paid by Hardware Plus that year. Therefore, petitioner's method of accounting for these payments was proper. To reflect the foregoing, Decision will be entered for petitioner. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Hardware Plus, Inc., formerly was named NuLoc Hardware, Inc. For clarity and consistency, both Hardware Plus and NuLoc Hardware, Inc., are referred to as Hardware Plus or petitioner.↩
3. Typically, an agency relationship exists between the manufacturer (the principal) and its representative (the agent). The manufacturer's representative sells the manufacturer's products to customers in a specific geographic area. The orders then are submitted to the manufacturer which ships the products directly to the customers. The manufacturer bills the customers and, usually after the customers have paid for the products, pays a commission to the manufacturer's representative.↩
4. Lee Smith Sales did not relinquish all of its manufacturer's representative contracts. It continued to exist as a corporation and continued to serve as a manufacturer's representative for companies that were not in competition with those represented by Hardware Plus.↩
5. Although it is not clear from the record exactly what territory Hardware Plus covered for Solar Hardware after September 30, 1988, presumably the territory was that which Lee Smith Sales previously covered and included at least the same area that Hardware Plus covered for Diamond F.↩
6. Neither party took the position that the lists provided by the Manufacturers constituted the intangible transferred under the Agreement. Those lists belonged to the Manufacturers and Lee Smith Sales had no right to sell them.↩
7. See infra↩ note 9 on the correct amortization period.
8. Neither party argued that the consideration should be allocated between "goodwill" or some intangible having an indefinite useful life and the covenant not to compete.↩
9. The Agreement also restricted Lee Smith Sales' activities with regard to competing Product Lines in the Territory.↩
10. Although it appears from the Agreement that the correct period was 6 years rather than 5 years, that point was never raised by the parties. Consequently, we will not question the length of the covenant not to compete for purposes of this case.↩