108 T.C. No. 3

UNITED STATES TAX COURT

INTERNATIONAL MULTIFOODS CORPORATION AND AFFILIATED COMPANIES,
 Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11643-92.                    Filed January 29, 1997.

        P was in the business of franchising the right to
operate Mister Donut shops in the United States and
abroad.  On Jan. 31, 1989, P sold its Asian and Pacific
Mister Donut business operations for $2,050,000.
Pursuant to the agreement, P transferred its franchise
agreements, trademarks, Mister Donut System, and
goodwill for each of the Asian and Pacific countries in
which P had existing franchise agreements, as well as
its trademarks and Mister Donut System for those Asian
and Pacific countries in which it had registered
trademarks but did not have franchise agreements.  In
the purchase agreement, P allocated $1,930,000 of the
sale price to goodwill and a covenant not to compete.
On its 1989 Federal income tax return, P reported the
income allocated to these assets as foreign source
income for purposes of computing P's foreign tax credit
limitation under sec. 904(a), I.R.C.  R determined that
the goodwill and covenant not to compete were inherent
in P's franchisor's interest.  R further determined

that the sale of P's franchisor's interest produced U.S. source income under sec. 865(d)(1), I.R.C.

Held: The goodwill inherent in the Mister Donut business in Asia and the Pacific was embodied in, and inseverable from, P's franchisor's interest and trademarks that were conveyed to D. The income attributable to the sale of P's franchisor's interest and trademarks constitutes U.S. source income under sec. 865(d)(1), I.R.C.

Held, further: P's covenant not to compete, which prohibited P from carrying on any business similar to Mister Donut or disclosing any part of the Mister Donut System in specified Asian and Pacific countries, possessed independent economic significance and is severable from P's franchisor's interest and trademarks.

Held, further: P has not shown that more than $300,000 of the sale price should be allocated to the covenant not to compete. R concedes that any amount allocated to the covenant constitutes foreign source income.

Held, further: A pro rata portion of P's selling expenses must be allocated to the sale of the covenant not to compete. Sec. 862(b), I.R.C.

David R. Brennan, John K. Steffen, Susan B. Grupe, and Nathan P. Zietlow, for petitioner.

Jack Forsberg, for respondent.

RUWE, Judge: Respondent determined deficiencies in petitioner's Federal income taxes as follows:

| Taxable Year Ended | Deficiency |
| --- | --- |
| Feb. 28, 1987 | $2,962,380 |
| Feb. 29, 1988 | 3,592,402 |

Petitioner paid these deficiencies following receipt of its notice of deficiency and then filed a petition with this Court claiming an overpayment of income tax for each year.  On December 6, 1993, petitioner filed a motion for leave to amend petition in order to claim an increased overpayment of income tax for its taxable year ended February 28, 1987, resulting from, among other things, an alleged foreign tax credit carryback from its taxable year ended February 28, 1989, in the amount of $952,015.  On January 28, 1994, this Court granted petitioner's motion in part and allowed petitioner to claim an increased overpayment of income tax resulting from the alleged foreign tax credit carryback from its 1989 taxable year.

Allowance of this foreign tax credit carryback depends upon our resolution of the issue we confront today.  We must decide what portion, if any, of the gain realized by petitioner on the sale of Asian and Pacific operations of Mister Donut of America, Inc. (Mister Donut), petitioner's wholly owned subsidiary, to Duskin Co. (Duskin) on January 31, 1989, constitutes foreign source income for purposes of computing petitioner's foreign tax credit limitation pursuant to section 904(a).[1]

---

[1]At trial, the parties addressed an additional issue: whether the loss realized by petitioner on the sale of the stock of Paty S.A.-Produtos Alimenticios, Ltda. (the Paty stock loss issue), constitutes a foreign source loss for purposes of computing petitioner's foreign tax credit limitation under sec. 904(a).  On July 8, 1996, the Internal Revenue Service issued proposed regulations involving the allocation of losses realized

(continued...)

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. At the time its petition was filed, petitioner maintained its principal place of business in Minneapolis, Minnesota.

Petitioner is a Delaware corporation which filed consolidated Federal income tax returns for itself and its affiliated subsidiaries for the relevant taxable years. During these years, petitioner and its subsidiaries were involved primarily in the manufacture, processing, and distribution of food products.

Mister Donut franchised Mister Donut pastry shops in the United States and abroad. As of January 1989, there were approximately 500 Mister Donut shops in the United States, 78 shops in Asia and the Pacific, and approximately 35 to 40 shops

---

[1](...continued)
on the disposition of stock. Under the regulations, petitioner would be able to elect retroactively to source its Paty stock loss in the United States. See sec. 1.865-2(a)(1), (e)(2)(i), Proposed Income Tax Regs., 61 Fed. Reg. 35696, 35698-35699 (July 8, 1996). On July 19, 1996, respondent filed a motion to sever the Paty stock loss issue and hold it in abeyance pending the filing of a status report by respondent in February 1997 regarding the finalization of the relevant regulations. Respondent's motion to sever issue will be granted.

in Europe, the Middle East, and Latin America.  Mister Donut joined in the filing of petitioner's consolidated returns. Hereinafter, we will generally refer to Mister Donut's transactions as petitioner's, since Mister Donut was petitioner's wholly owned subsidiary.

Petitioner's Asian and Pacific Mister Donut Operations

As of January 1989, petitioner had registered Mister Donut trademarks in the following countries:  Indonesia, the Philippines, Taiwan, Thailand, Australia, the People's Republic of China, Hong Kong, Malaysia, New Zealand, Singapore, and South Korea.

Petitioner, as franchisor, had entered into Mister Donut franchise agreements in Indonesia, the Philippines, Thailand, and Taiwan[2] (the operating countries).  The franchise agreements in effect on January 31, 1989, were as follows:

| Date of Initial Agreement | Territory | Franchisee | No. of Mister Donut Shops |
|---|---|---|---|
| Apr. 30, 1987 | Indonesia | PT Naga Puspita Bujana | 2 |
| Nov. 16, 1981 | Philippines | Naque Franchising Co. | 49 |
| Mar. 16, 1984 | Taiwan | Continental Foods | 6 |
| May 19, 1978 | Thailand | Thai Franchising Co. | 21 |

[2]Although styled a Technical Cooperation Agreement, petitioner's agreement in Taiwan was, in all material respects, the same as its franchise agreements.

These agreements contained substantially similar requirements except for provisions dealing with franchise fees, royalties,[3] development schedules, and the length of the agreement.[4]  As of January 31, 1989, petitioner did not have franchise agreements in any of the other countries in which it had registered trademarks; i.e., Australia, Hong Kong, Malaysia, New Zealand, the People's Republic of China, Singapore, and South Korea (the nonoperating countries).

Mister Donut had perfected a system that utilized franchisees to prepare and merchandise distinctive quality doughnuts, pastries, and other food products.  The franchise agreements refer to this system as the "Mister Donut System", which is described as:

---

[3]The agreements provided for the payment of royalties equal to the following percentages of the franchisees' gross sales:

| Agreement | Royalty Percentage |
|-----------|--------------------|
| Indonesia | 3.90 |
| The Philippines | 3.50 |
| Taiwan (as amended) | 3.50 |
| Thailand (as amended) | 3.35 |

[4]The franchise agreements for the Philippines and Thailand had 20-year terms, while the agreement for Indonesia had an initial term of 20 years with an option for the franchisee to extend the agreement for additional 20-year periods.  The agreement for Taiwan, as amended, provided for a term of 20 years with an option for the franchisee to extend the agreement for one additional 20-year period.

the name "Mister Donut", a unique and readily recognizable design, color scheme and layout for the premises wherein such business is conducted (herein called a "Mister Donut Shop") and for its furnishings, signs, emblems, trade names, trademarks, certification marks and service marks * * *, all of which may be changed, improved and further developed from time to time * * *

The Mister Donut System also included methods of preparation, serving and merchandising doughnuts, pastries, and other food products, and the use of specially prepared doughnut, pastry, and other food product mixes as may be changed, improved, and disclosed to persons franchised by petitioner to operate a Mister Donut shop.

Petitioner granted franchisees the right to open a fixed number of Mister Donut shops pursuant to established terms and conditions and at locations approved by petitioner.[5] The franchise agreements provided that petitioner would not open or authorize others to open any Mister Donut shops in the franchisee's territory[6] until the franchise agreement expired or was terminated, or unless the franchisee did not meet its development schedule by failing to open the requisite number of Mister Donut shops by the agreed-upon date. In the event the

---

[5]Subject to certain limitations, the franchise agreements permitted franchisees to subfranchise Mister Donut shops within the respective franchisee's territory.

[6]Hereinafter, "territory" is a reference to one of the 11 operating and nonoperating countries.

franchisee failed to open the agreed-upon number of shops, it lost its exclusive rights in the territory and could not open any additional Mister Donut shops. Petitioner could then operate, or authorize others to operate, Mister Donut shops in the territory, so long as the newly opened shops were not within a certain proximity of the franchisee's already existing shops.

Franchisees were entitled to use the building design, layout, signs, emblems, and color scheme relating to the Mister Donut System, along with petitioner's copyrights, trade names, trade secrets, know-how, and preparation and merchandising methods, as well as any other valuable and confidential information. However, petitioner retained exclusive ownership of its current and future trademarks, as well as any additional materials that constituted an element of the Mister Donut System. Use of these assets was prohibited after the termination of the franchise agreement.

The franchise agreements obligated petitioner to provide training at petitioner's training facility in Saint Paul, Minnesota, for employees of the franchisees. Instructional programs covered every aspect involved in the operation of a Mister Donut franchise, including production procedures and techniques, personnel matters, accounting, promotion, and maintenance. Petitioner required its new international franchisees to send a minimum of two employees to the training

programs, which consisted of a basic 4-week class plus a 2-week supplemental class for international franchisees.[7]

In addition, when franchisees opened their initial Mister Donut shops, petitioner provided them with the assistance of two Mister Donut employees for a 3-week period to work with the shop's manager and to assist in the training of the bakers and sales personnel. Petitioner also provided its franchisees with manuals, which covered all aspects of managing and operating a Mister Donut franchise, such as operating and production procedures, baked goods, training, equipment, advertising, repair and maintenance, sanitation, and special programs. The franchise agreements contained strict confidentiality provisions and provided that the Mister Donut manuals remained the property of petitioner and were to be returned to it upon termination of the franchise agreement.

In order to ensure that the distinguishing characteristics of the Mister Donut System were uniformly maintained, petitioner established standards for furnishings, equipment, finished product mixes, and supplies,[8] which the franchisees were required

---

[7]International franchisees could send additional employees for training each year.

[8]Petitioner had entered into supplier agreements with manufacturers outside the United States, licensing them to produce bakery mixes, fillings, and other products to its specifications for sale to Mister Donut franchisees and subfranchisees. These agreements obligated suppliers to meet petitioner's quality standards, prohibited suppliers from selling
(continued...)

to meet.  The agreements also required that franchisees operate their shops in accordance with petitioner's standards of quality, preparation, appearance, cleanliness, and service.

Petitioner's Sale of Its Asian and Pacific Mister Donut
Operations to Duskin

Duskin is a Japanese corporation which markets a variety of goods and services, primarily through franchise operations.  On November 19, 1983, petitioner and Duskin entered into an agreement for the sale of petitioner's assets, rights, and interests in Mister Donut in Japan (the Japan Agreement).  The Japan Agreement also included a covenant by petitioner not to compete in the donut business in Japan for a period of 20 years, as well as a covenant by Duskin not to conduct any business similar to the Mister Donut business anywhere outside Japan for a period of 10 years.

By the end of 1986, petitioner had decided to sell its food distribution and franchise business.  Petitioner was having difficulty providing adequate service to its Mister Donut operations in Asia and the Pacific.  Duskin was seeking to expand into new territories as it had nearly saturated the Japanese market.  Given its organization, financing, and experience,

---

[8](...continued)
Mister Donut products to anyone other than Mister Donut franchisees or subfranchisees, and imposed strict confidentiality requirements on the suppliers to prevent the disclosure of petitioner's formulas and trade secrets.

Duskin appeared the logical buyer for petitioner's franchisor's interest in Mister Donut in Asia and the Pacific.

On January 31, 1989, following 2 years of negotiations, petitioner and Duskin entered into an agreement for the sale of petitioner's entire interest in Mister Donut in designated Asian and Pacific nations for $2,050,000. Pursuant to the agreement, petitioner sold its existing franchise agreements, trademarks, Mister Donut System, and goodwill for each of the operating countries, and its trademarks[9] and Mister Donut System in the nonoperating countries. Joseph Dubanoski, formerly a division vice president with petitioner whose primary responsibilities involved the development and implementation of international franchises, determined petitioner's sale price. In arriving at this amount, Mr. Dubanoski considered: (1) The royalty income generated in the operating countries; (2) the growth potential in the operating countries; (3) the development potential in the nonoperating countries; and (4) the value of the trademarks in the operating and nonoperating countries.

Although nothing in the franchise agreements required petitioner to obtain the consent of the franchisees before assigning its rights as franchisor, Duskin expressed concern that franchisees might be unwilling to work with a Japanese company.

---

[9]Included within the transfer of the Mister Donut trademarks were trademark applications which petitioner had filed and which presumably were pending as of the date of the purchase agreement.

Therefore, the purchase agreement required petitioner to obtain an agreement from each franchisee consenting to the assignment of petitioner's franchisor's interest to Duskin. Duskin also expressed concern as to whether petitioner would be able to obtain the requisite approvals and consents and complete the acts necessary to transfer the trademarks and franchise agreements. Consequently, petitioner included two provisions in the purchase agreement which provided for a refund to Duskin of a portion of the sale price in the event petitioner was unable to transfer all or some of the franchise agreements and trademarks.

Article V, paragraph 3(a), of the purchase agreement listed various documents that petitioner was to deliver to Duskin to establish that the transfer of the Mister Donut trademarks for the nonoperating countries had been perfected.[10] Article V, paragraph 4, provided that in the event petitioner was unable to deliver the requisite documents, petitioner would refund $615,000 of the purchase price to Duskin, and Duskin would reconvey the trademarks and Mister Donut System for the nonoperating countries.

---

[10]In addition to the trademarks and Mister Donut System, petitioner was responsible for delivering the following documents: (1) Certified resolutions from petitioner's board of directors authorizing performance on the purchase agreement; (2) an opinion letter from counsel for petitioner stating that the purchase agreement was valid and enforceable; and (3) an opinion letter from the law firm of Baker & McKenzie confirming that petitioner's title in the trademarks in the nonoperating countries had been transferred to Duskin.

In addition, article VII, paragraph 1, listed various consents, approvals, assignments, and other documents that petitioner was required to deliver to Duskin with respect to the transfer of the trademarks, franchise agreements, and supplier agreements for the operating countries.  Article VII, paragraph 2, provided that a portion of the purchase price would be refunded if petitioner was unable to deliver the requisite documents for one or more of the operating countries.  The amount of the refund was dependent upon the number of operating countries with respect to which petitioner was unable to deliver all necessary documents:

| No. of Operating Countries With Respect to Which Post-Closing Assignments and Consents Are not Delivered | Purchase Price Adjustment |
| --- | --- |
| 4 | $700,000 or $500,000 and Hawaii license |
| 3 | $400,000 or $200,000 and Hawaii license |
| 2 | $150,000 or $50,000 and Hawaii license |
| 1 | Hawaii license |

[1]"Hawaii license" is a reference to a provision in the purchase agreement that permitted Duskin to opt for a perpetual, prepaid license to use the Mister Donut trademark in Hawaii in exchange for a reduction in the amount of cash to be refunded from petitioner.

Petitioner satisfied all the terms in the purchase agreement, and no price adjustments were made.

The purchase agreement also contained a covenant by petitioner not to compete in the operating and nonoperating countries for a period of 20 years.  Article XIV, paragraph 1, of the agreement stated:

> MDAI [Mister Donut] covenants and agrees with Duskin that, for a period of twenty (20) years commencing on the Post-Closing Date, MDAI will not, either directly or indirectly:
>
> (a) carry on in any of the Non-Operating Countries or in any of the Duskin Operating Countries any business similar to the Mister Donut shop business being sold and transferred by MDAI to Duskin on the Post-Closing Date;
>
> (b) otherwise sell doughnuts in any of the Non-Operating Countries or any of the Duskin Operating Countries; or
>
> (c) disclose all or any part of the Mister Donut System or any of the bakery mix formulae, with or without the payment of consideration, to any person for use in any of the Non-Operating Countries or the Duskin Operating Countries.  * * *

The agreement similarly contained a covenant by Duskin not to compete in any business similar to the Mister Donut business in the United States, Canada, and 38 European, Mideastern, Caribbean, and Latin American countries for a period of 5 years. The countries included in the Duskin covenant were nations where petitioner had Mister Donut franchise operations or registered trademarks.[11]

---

[11]The purchase agreement also amended Duskin's covenant not to compete contained in the Japan Agreement to conform with

(continued...)

Petitioner's Allocation and Reporting of the Proceeds From the
Sale

Duane A. Suess and John D. Schaefer were employees in
petitioner's tax department and were involved in the sale of the
Mister Donut franchise business in Asia and the Pacific.  Messrs.
Suess and Schaefer reviewed all drafts of the purchase agreement.

The first draft, which was dated January 20, 1988, and
prepared by Bruce M. Bakerman of petitioner's legal department,
contained a provision allocating the purchase price between the
existing franchises, goodwill, trademarks, and pending trademark
applications.  The actual percentage to be allocated to these
assets was left blank.  Mr. Suess reviewed this draft and
handwrote the following on the document:

> Approve subject to:
>
> 1) Review of foreign tax consequences associated
> with each country covered by the agreement;
>
> 2) Review of foreign source income rules to
> determine best way to maximize foreign source income.
> Initial review indicates goodwill and noncompete
> covenants may give rise to such income.
>
> 3) Allocation of proceeds will be critical aspects
> of 1 & 2 above, therefore flexibility in this area
> should be a major negotiating point.

---

[11](...continued)
Duskin's covenant under the purchase agreement.  As a result,
Duskin was no longer precluded from competing in the donut
business outside Japan; rather, Duskin could compete anywhere in
the world outside of 41 enumerated countries, none of which were
located in Asia.

In a memorandum dated May 24, 1988, from Michael S. Munro to Paul Quinn, Mr. Munro recommended that the purchase agreement should not contain an allocation of the sale price.[12] In response to this suggestion, petitioner's legal department removed the allocation from the subsequent draft dated May 25, 1988. However, in a memorandum dated May 27, 1988, Mr. Schaefer expressed concern regarding the absence of such an allocation:

> The lack of any purchase price allocation in the Agreement is not particularly helpful from a U.S. tax viewpoint. However, the fact that the purchaser is a Japanese entity and the current lack of distinction in the amount of tax on capital gains and ordinary income minimizes this concern.
>
> It could be advantageous to have a portion of the purchase price allocated to "goodwill" in the four Far East countries where Mister Donut already has franchisees.
>
> My main concern, though, is with uncertain tax consequences surrounding the transfer of trademarks in the Peoples Republic of China, Taiwan, Indonesia, Malaysia, Singapore, and Hong Kong. It is possible that the trademark transfers could generate a tax in these countries. Therefore, if amounts are to be allocated to the trademarks associated with these countries, the purchase price allocated to them should be as little as possible. If this is not practical as negotiations continue, I would appreciate it if you could keep me advised so that I can get some outside professional help with respect to the tax consequences of the trademark sale in these countries.

---

[12]Mr. Munro was an assistant to Mr. Quinn, petitioner's group vice president for international affairs.

In a memorandum dated September 8, 1988, Mr. Suess provided draft language for a provision allocating the purchase price between goodwill, trademarks, and petitioner's covenant not to compete. In his memorandum, Mr. Suess stated:

> In negotiating the allocation it is important to note that the amounts allocated to goodwill and the noncompete covenant, to the extent upheld upon IRS audit, will be tax-free to Multifoods. The amount allocated to the trademarks and pending trademark applications will be subject to a tax of approximately 38% in the U.S. and potentially additional taxes in the countries in which such trademarks are registered. Therefore, to the extent that we can maximize the allocation to the goodwill and non-compete covenant, we will maximize Multifoods' after-tax gain on the sale.

> You requested that I advise you of the potential tax consequences to Duskin of the purchase price allocation. As previously discussed, both goodwill and trademarks are generally amortizable for tax purposes in Japan. Non-compete covenants are also generally amortizable for tax purposes in Japan. Therefore, it is possible that Duskin may be indifferent to the specific amounts allocated to each type of asset.
> * * *

On or about January 27, 1989, petitioner obtained a draft of an appraisal from the Valuation Engineering Associates Division of Touche Ross (Touche Ross), allocating the sale price among the assets to be sold. Duskin was not involved in the selection of Touche Ross, nor did it indicate to petitioner its preferred allocation.

On January 31, 1989, Touche Ross submitted its final report, which stated:

Based on our limited review of information provided to us, we allocated the $2,050,000 purchase, as follows:

| | | |
|---|---|---|
| Trademarks | $120,000 | 6% |
| Non-competition | 820,000 | 40% |
| Goodwill | 1,110,000 | 54% |
| Total | $2,050,000 | 100% |

Article IV, paragraph 3, of the purchase agreement contained the same allocation.

In reporting its foreign and domestic source income for its taxable year ended February 28, 1989, petitioner followed the allocation contained in article IV of the purchase agreement. After allocating its selling expenses among the goodwill and trademarks sold to Duskin, petitioner reported $1,016,643[13] of foreign source income from the sale of goodwill, $820,000 of foreign source income from the covenant not to compete, and $109,907 of U.S. source income from the sale of the trademarks. Petitioner did not allocate any of its selling expenses to the sale of the covenant not to compete.

## OPINION

We must determine what portion, if any, of the gain on petitioner's sale of its Asian and Pacific Mister Donut operations constitutes foreign source income for purposes of

---

[13]The parties have stipulated that petitioner should have allocated selling expenses of $97,398 to goodwill, which would have produced income in the amount of $1,012,602.

computing petitioner's foreign tax credit limitation under section 904(a).

We begin with the sourcing of income rules under section 865. Section 865(a)(1) provides that income from the sale of personal property by a U.S. resident[14] is generally sourced in the United States. Section 865(d) provides that in the case of any sale of an intangible, the general rule applies only to the extent that the payments in consideration of such sale are not contingent on the productivity, use, or disposition of the intangible. Sec. 865(d)(1)(A). Section 865(d)(2) defines "intangible" to mean any patent, copyright, secret process or formula, goodwill, trademark, trade brand, franchise, or other like property. Section 865(d)(3) carves out a special sourcing rule for goodwill. Payments received in consideration of the sale of goodwill are treated as received from sources in the country in which the goodwill was generated.

1. <u>Goodwill</u>

Petitioner allocated $1,110,000 of the sale price to goodwill. On brief, petitioner maintains that the franchisor's interest it conveyed to Duskin consisted exclusively of intangible assets in the nature of goodwill; i.e., franchises, trademarks, and the Mister Donut System. Petitioner contends

---

[14]Sec. 865(g)(1)(A)(ii) defines "United States resident" to include a domestic corporation. See sec. 7701(a)(30).

that the income attributable to the sale of this goodwill constitutes foreign source income pursuant to section 865(d)(3).[15]

This argument mistakes goodwill for the intangible assets which embody it. Goodwill represents an expectancy that "old customers will resort to the old place" of business. Houston Chronicle Publishing Co. v. United States, 481 F.2d 1240, 1247 (5th Cir. 1973); Canterbury v. Commissioner, 99 T.C. 223, 247 (1992). The essence of goodwill exists in a preexisting business relationship founded upon a continuous course of dealing that can be expected to continue indefinitely. Canterbury v. Commissioner, supra at 247; Computing & Software, Inc. v. Commissioner, 64 T.C. 223, 233 (1975). The Supreme Court has explained that "The value of every intangible asset is related, to a greater or lesser degree, to the expectation that customers will continue their patronage [i.e., to goodwill]." Newark Morning Ledger Co. v. United States, 507 U.S. 546, 556 (1993). An asset does not constitute goodwill, however, simply because it contributes to this expectancy of continued patronage.

Section 865(d)(1) provides that income from the sale of an intangible asset by a U.S. resident will generally be sourced in the United States. Section 865(d)(2) defines "intangible" to

_____

[15]On brief, petitioner appears to concede that no goodwill existed with respect to its trademarks in the nonoperating countries, since it had no franchises in those countries or customers who could "return" to Mister Donut stores.

include, among other things, secret processes or formulas, goodwill, trademarks, and franchises. Section 865(d)(3) then provides a special rule for goodwill, sourcing it in the country in which it was generated.

Petitioner's argument equates goodwill with the other assets listed in the definition of "intangible" in section 865(d)(2). This Court has recognized that intangible assets such as trademarks and franchises are "inextricably related" to goodwill. Canterbury v. Commissioner, supra at 249-251; see also Philip Morris, Inc. v. Commissioner, 96 T.C. 606, 634 (1991), affd. without published opinion 970 F.2d 897 (2d Cir. 1992). However, we believe that Congress' enumeration of goodwill in section 865(d)(2) as a separate intangible asset necessarily indicates that the special sourcing rule contained in section 865(d)(3) is applicable only where goodwill is separate from the other intangible assets that are specifically listed in section 865(d)(2). If the sourcing provision contained in section 865(d)(3) also extended to the goodwill element embodied in the other intangible assets enumerated in section 865(d)(2), the exception would swallow the rule. Such an interpretation would nullify the general rule that income from the sale of an intangible asset by a U.S. resident is to be sourced in the United States.[16] See Torres v. McDermott Inc., 12 F.3d 521, 526

---

[16]Indeed, in the purchase agreement, petitioner failed to
(continued...)

(5th Cir. 1994); <u>Israel-British Bank (London), Ltd. v. FDIC</u>, 536 F.2d 509, 512-513 (2d Cir. 1976); <u>Edward B. Marks Music Corp. v. Colorado Magnetics, Inc.</u>, 497 F.2d 285, 288 (10th Cir. 1974).[17]

Respondent contends that, although not denominated as such, what Duskin acquired from petitioner was a territorial franchise for the operating and nonoperating countries. Petitioner, on the other hand, argues that it did not sell Duskin a franchise, but, rather, the entire Mister Donut franchising business in Asia and the Pacific. Petitioner maintains that the sale of a franchise requires the franchisor to retain an interest in the business and that petitioner failed to retain the requisite interest in this case following the sale to Duskin. Petitioner contends that section 1253(a) and our opinion in <u>Jefferson-Pilot Corp. v. Commissioner</u>, 98 T.C. 435 (1992), affd. 995 F.2d 530 (4th Cir. 1993), support its interpretation of "franchise".

Although section 865 does not provide a definition of franchise, section 1253(b)(1) defines it for purposes of section

---

[16](...continued)
allocate any portion of the sale price to the franchise agreements. Instead, petitioner allocated $1,930,000 to goodwill and the covenant not to compete and later reported this amount as foreign source income on its 1989 Federal income tax return. Petitioner allocated the remaining $120,000 of the sale price to the trademarks and reported this amount as U.S. source income on its 1989 return.

[17]In <u>Edward B. Marks Music Corp. v. Colorado Magnetics, Inc.</u>, 497 F.2d 285, 288 (10th Cir. 1974), the court stated that "it is the general rule that a proviso should be strictly construed to the end that an exception does not devour the general policy which a law may embody."

1253(a) to include "an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area."  We have found this definition to be consistent with the common understanding of the term.  Jefferson-Pilot Corp. v. Commissioner, supra at 440-441.  When Congress uses a term that has accumulated a settled meaning under equity or the common law, courts must infer that Congress intended to incorporate the established meaning of the term, unless the statute otherwise dictates.  NLRB v. Amax Coal Co., 453 U.S. 322, 329 (1981); see also Jefferson-Pilot Corp. v. Commissioner, supra at 442 n.8.  Since we find no indication that Congress intended "franchise" to carry a different meaning in the context of section 865, we adopt this definition for purposes of this section.

Pursuant to section 1253(a), the transfer of a franchise, trademark, or trade name shall not be treated as the sale or exchange of a capital asset if the transferor retains a significant power, right, or continuing interest with respect to the subject matter of the franchise, trademark, or trade name. Prior to its amendment in the Omnibus Budget Reconciliation Act of 1993 (OBRA), Pub. L. 103-66, sec. 13261(c), 107 Stat. 312, 539,[18] section 1253(d)(2)(A) provided that if a transfer of a

---

[18]Congress amended sec. 1253(d) by replacing pars. (2), (3), (4), and (5) with the following:

(continued...)

franchise, trademark, or trade name is not treated as the sale or exchange of a capital asset, then any single payment in discharge of a principal sum agreed upon in the transfer agreement shall be deducted ratably by the payor over a period of 10 years or the period of the transfer agreement, whichever is shorter.

In <u>Jefferson-Pilot</u>, the taxpayer's subsidiary purchased three radio stations, and the taxpayer sought a deduction under section 1253(d)(2) for a portion of the purchase price, which it claimed was attributable to Federal Communications Commission (FCC) broadcast licenses transferred pursuant to the sale.  We concluded that the FCC licenses constituted franchises under section 1253, and a ratable portion of the purchase price attributable to the licenses was deductible under section 1253(d)(2).  We found that the FCC had retained the right to disapprove of any assignment of the licenses, as well as the right to prescribe standards of quality for broadcasting services

---

[18](...continued)
    (2) Other payments.--Any amount paid or incurred on account of a transfer, sale, or other disposition of a franchise, trademark, or trade name to which paragraph (1) [sec. 1253(d)(1)] does not apply shall be treated as an amount chargeable to capital account.

    (3) Renewals, etc.--For purposes of determining the term of a transfer agreement under this section, there shall be taken into account all renewal options (and any other period for which the parties reasonably expect the agreement to be renewed).

Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, sec. 13261(c), 107 Stat. 312, 539.

and for the equipment used to broadcast.  <u>Jefferson-Pilot Corp.
v. Commissioner</u>, <u>supra</u> at 447.

Neither the language of section 1253(a) nor our opinion in
<u>Jefferson-Pilot</u> supports petitioner's position.  Section 1253(a)
provides that the transfer of a franchise will not be treated as
the sale or exchange of a capital asset so long as the transferor
retains a significant power, right, or continuing interest with
respect to the subject matter of the franchise.  The necessary
implication is that a franchise can be transferred without the
retention by the transferor of any significant degree of control.
In such a case, the transfer will be treated as the sale or
exchange of a capital asset, and the transferee will not be
permitted to amortize any portion of the purchase price.  See
sec. 1253(d)(2) (prior to amendment by OBRA sec. 13261(c)).
Indeed, if petitioner's argument were correct, section 1253(a)
would have been altogether unnecessary, as the sale of a
franchise would only occur where the transferor retained a
significant interest in the franchise.  However, as we explained
in <u>Jefferson-Pilot Corp. v. Commissioner</u>, 98 T.C. at 441-442 n.7:

>     Sec[tion] 1253 requires a two-step analysis.  First, we
>     must determine if the interest transferred was a
>     "franchise" as defined in sec[tion] 1253(b)(1); then we
>     determine whether a significant power was retained.
>     Limiting the definition of "franchise" based on
>     inferences from the retained powers requirement begs

the question of whether the interest transferred is a "franchise" in the first place. [Citation omitted.[19]]

Petitioner's sale of its Mister Donut operations to Duskin constituted the sale of a "franchise" for purposes of section 865(d)(2). Petitioner transferred to Duskin its existing franchise agreements, trademarks, and Mister Donut System in each of the operating countries, as well as its trademarks and Mister Donut System in the nonoperating countries. Petitioner's Mister Donut operation utilized franchisees to prepare and merchandise distinctive quality doughnuts. This system included methods of preparation, serving, and merchandising doughnuts. In the purchase agreement, petitioner not only sold Duskin petitioner's rights as franchisor in the existing franchise agreements in the operating countries, but also all its rights to exclusive use in the designated Asian and Pacific territories of its secret formulas, processes, trademarks, and supplier agreements; i.e., its entire Mister Donut System. Duskin received petitioner's existing rights as franchisor, as well as the right to enter franchise agreements in the nonoperating countries.

Respondent argues that any goodwill associated with the Asian and Pacific franchise business was part of, and inseverable

---

[19]Petitioner transferred its interest in Mister Donut in certain designated Asian and Pacific countries only. As of Jan. 31, 1989, petitioner presumably had retained its rights to the Mister Donut System everywhere other than the 11 operating and nonoperating countries and Japan.

from, the franchisor's rights and trademarks acquired by Duskin. Respondent maintains that any gain attributable to the sale of franchises or the trademarks produces U.S. source income, as section 865 generally sources income in the residence of the seller. See sec. 865(a),(d)(1).

While there are no cases on point under section 865, case law interpreting other provisions of the Code supports respondent's position. In Canterbury v. Commissioner, 99 T.C. 223 (1992), we considered whether the excess of a franchisee's purchase price of an existing McDonald's franchise over the value of the franchise's tangible assets was allocable to the franchise or to goodwill for purposes of amortization pursuant to section 1253(d)(2)(A). We recognized that McDonald's franchises encompass attributes that have traditionally been viewed as goodwill. The issue, therefore, was whether these attributes were embodied in the McDonald's franchise, trademarks, and trade name, which would make their cost amortizable pursuant to section 1253(d)(2)(A), or whether the franchisee acquired intangible assets, such as goodwill, which were not encompassed by, or otherwise attributable to, the franchise and which were nonamortizable.

We found that the expectancy of continued patronage which McDonald's enjoys "is created by and flows from the implementation of the McDonald's system and association with the

McDonald's name and trademark."  Id. at 248 (fn. ref. omitted).

In addition, we stated:

> The right to use the McDonald's system, trade name, and
> trademarks is the essence of the McDonald's franchise.
> * * *  Respondent did not identify, and we cannot
> discern, any quantifiable goodwill that is not
> attributable to the franchise.  We find that
> petitioners acquired no goodwill that was separate and
> apart from the goodwill inherent in the McDonald's
> franchise.
>
> [T]he franchise acts as the repository for goodwill
> * * *  [Id. at 249; fn. ref. omitted; emphasis added.]

We concluded that the goodwill produced by the McDonald's system

was embodied in, and inseverable from, the McDonald's franchise

that the taxpayer received.[20]

Similarly, in Montgomery Coca-Cola Bottling Co. v. United

States, 222 Ct. Cl. 356, 381-382, 615 F.2d 1318, 1331-1332

(1980), the Court of Claims, in valuing a Coca-Cola franchise,

explained:

> Defendant's expert has testified that there is no
> goodwill in a Coca-Cola bottling operation.  Anything
> resembling goodwill attaches solely to the national
> company and the name of the product * * *.  Customers
> buy Coca-Cola because of * * * the product, not because
> of who bottles it.  Since goodwill is considered to be
> the value of the habit of customers to return to
> purchase a product at the same location, the absence of
> the product would destroy the value of the habit; and
> since only one entity has the perpetual right to
> distribute Coca-Cola in a territory, the value of

---

[20]Although Canterbury v. Commissioner, 99 T.C. 223 (1992),
involved a sale by a franchisee, we find its analysis of this
issue applicable to the instant case as well.

goodwill, and the franchise are so interrelated as to be indistinquishable, all the value should then be assigned to the franchise. * * *  [Emphasis added; fn. ref. omitted.]

In Zorniger v. Commissioner, 62 T.C. 435 (1974), we addressed the issue of whether the taxpayer's shares of stock in a Chevrolet dealership possessed goodwill that should have been reflected in the valuation of the stock for purposes of the gift tax.  We held that no goodwill existed in the stock, since the dealership agreement required Chevrolet's prior approval of any transfer of the taxpayer's interest therein.  Id. at 444-445.  We relied principally on our decision in Akers v. Commissioner, 6 T.C. 693, 700 (1946), where we determined that no goodwill existed in a General Motors' dealership upon liquidation, as the taxpayer had a nontransferable, personal services contract, which could have been divested from the taxpayer under circumstances outside his control.  In Zorniger v. Commissioner, supra at 444-445 (quoting Akers v. Commissioner, supra at 700), we stated:

"The franchises were not assignable and by their terms were made personal contracts between the parties.  Such good will or going-concern value as the corporation might have created during its existence was subject at all times to be divested by termination of the franchises without action by the corporation.  * * *

The good will, if any, continued to be embodied in the franchises and they, under the circumstances, were not property subject to transfer or other disposition by the corporation."  [Citation omitted.]

It is also well established that trademarks embody goodwill. Renziehausen v. Lucas, 280 U.S. 387, 388 (1930); Stokely USA, Inc. v. Commissioner, 100 T.C. 439, 447 (1993); Canterbury v. Commissioner, supra at 252; Philip Morris Inc. v. Commissioner, 96 T.C. at 636. Consumers associate the Mister Donut trademark with their pleasurable experience at Mister Donut shops. As a result, goodwill is also embodied in the trademarks, which Duskin acquired and which cause customers to return to Mister Donut shops in the future and patronize them.

Petitioner's business in the operating countries was conducted by granting Mister Donut franchises. Under the purchase agreement, Duskin received petitioner's rights as franchisor under the existing franchise agreements in the operating countries. The franchisees in the operating countries possessed the exclusive right to open stores pursuant to established conditions and at locations approved by the franchisor. In order to ensure that the distinguishing characteristics of Mister Donut were uniformly maintained, the franchise agreements had established standards for furnishings, equipment, product mixes, and supplies, which the franchisees were required to meet. The franchise agreements also required that franchisees operate their shops in accordance with uniform standards of quality, preparation, appearance, cleanliness, and service. The agreements provided that the franchisor could not open, or authorize others to open, any Mister Donut shops in the

franchisee's country until the franchise agreement expired, or was terminated, or unless the franchisee did not meet its development schedule by failing to open the requisite number of Mister Donut shops.

Mister Donut's success resulted from the Mister Donut System and the high standards for quality and service, which the franchisees were required to meet. See supra p. 9. Although these characteristics produced goodwill in the operating countries, that goodwill was embodied in the franchises and trademarks conveyed to Duskin.

Petitioner also transferred its Mister Donut System and trademarks for each of the nonoperating countries. Duskin received the right to exploit--either by entering franchise agreements in these territories or by opening shops itself--the Mister Donut System along with the accompanying trademarks, formulas, and other intangible assets. In the nonoperating countries, there were no Mister Donut shops for customers to patronize at the time the purchase agreement was executed. Goodwill is founded upon a continuous course of dealing that can be expected to continue indefinitely. Canterbury v. Commissioner, 99 T.C. at 247; see also Computing & Software, Inc. v. Commissioner, 64 T.C. at 233. Goodwill is the expectancy of continued patronage. Houston Chronicle Publishing Co. v. United States, 481 F.2d at 1247. Petitioner concedes on brief that

> in the operating countries where the franchises had been developed, the value to Duskin was in obtaining the assets which comprised the goodwill. In contrast, there was no value, or negligible value, in the trademarks or trade names in the non-operating countries. * * * <u>Thus, in the non-operating countries where the franchises had not been developed, any value acquired by Duskin was merely for the right to do so.</u> [Emphasis added.]

Petitioner has failed to establish that it transferred any goodwill in the nonoperating countries other than what might have been embodied in its trademarks.

We find that petitioner did not establish that it transferred any goodwill separate and apart from the goodwill inherent in the franchisor's interest and trademarks that petitioner conveyed to Duskin. Pursuant to section 865(d)(1), income attributable to the sale of a franchise or a trademark is sourced in the residence of the seller. The income petitioner received upon the sale of these assets must, therefore, be sourced in the United States.

2. <u>Covenant Not To Compete</u>

The only remaining asset transferred to Duskin that could produce foreign source income is petitioner's covenant not to compete. Respondent concedes that any amount allocated to the covenant constitutes foreign source income to petitioner.

Respondent argues that the covenant (like goodwill) was inseverable from the franchisor's interest that petitioner

conveyed to Duskin.  Respondent alleges that the franchise rights Duskin acquired provided it with the exclusive right to use the know-how, trade secrets, trademarks, and other components of the Mister Donut System in the operating and nonoperating countries. Any competition or disclosure of the Mister Donut System by petitioner in these countries, respondent contends, would have deprived Duskin of the beneficial enjoyment of the rights it had acquired.  Thus, respondent maintains that petitioner's covenant should be viewed as an inseverable element of the franchisor's interest acquired by Duskin.  We disagree.

The covenant granted Duskin benefits in addition to those necessarily conveyed by petitioner's transfer of its franchisor's interests and trademarks.  The covenant prohibited petitioner from conducting any business similar to the Mister Donut business in the operating or nonoperating countries or from otherwise selling doughnuts in any of these countries.  Since petitioner possessed expertise, knowledge, and contacts regarding the donut business, it was reasonable for Duskin to preclude petitioner from reentering the donut business in Asia and the Pacific under a different name.  We conclude that the covenant not to compete possessed independent economic significance, as it did more than simply preclude petitioner from depriving Duskin of rights which it had acquired in purchasing petitioner's franchise rights and trademarks.  As we stated in Horton v. Commissioner, 13 T.C. 143, 147 (1949) (Court reviewed):

It is well settled that if, in an agreement of the kind which we have here, the covenant not to compete can be segregated in order to be assured that a separate item has actually been dealt with, then so much as is paid for the covenant not to compete is ordinary income and not income from the sale of a capital asset.  * * *

See also General Ins. Agency, Inc. v. Commissioner, 401 F.2d 324, 329-330 (4th Cir. 1968), affg. T.C. Memo. 1967-143.

It is necessary, therefore, to determine what portion of the $2,050,000 sale price must be allocated to the covenant not to compete.  Petitioner bears the burden of proof.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Peterson Mach. Tool, Inc. v. Commissioner, 79 T.C. 72, 81 (1982), affd. without published opinion 54 AFTR 2d 84-5407, 84-2 USTC par. 9885 (10th Cir. 1984).

Petitioner urges us to uphold the allocation in the purchase agreement of $820,000.  Petitioner relies upon case law indicating that an allocation in a purchase agreement to a covenant not to compete will be respected for Federal income tax purposes if it was the intent of the parties to make such an allocation and the covenant possessed independent economic significance.  See, e.g., Major v. Commissioner, 76 T.C. 239, 246 (1981).

We decline to place reliance upon the allocation contained in the purchase agreement.  The cases upholding the contracting parties' allocation of a specific amount to a covenant not to

compete are premised upon the assumption that the competing tax interests of the parties will ensure that the allocation is the result of arm's-length bargaining.  Where the assumption is unwarranted, there is no reason to be bound to the allocation in the contract.  See, e.g., Patterson v. Commissioner, 810 F.2d 562, 570 (6th Cir. 1987), affg. T.C. Memo. 1985-53; Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960); Lemery v. Commissioner, 52 T.C. 367, 375-376 (1969), affd. per curiam 451 F.2d 173 (9th Cir. 1971).  In the instant case, Mr. Suess' memorandum of September 8, 1988, indicates that the interests of Duskin and petitioner were apparently not adverse as to the allocation of the sale price.  No representatives from Duskin testified at trial regarding whether Duskin considered the allocation important, and, given Mr. Suess' statements, we suspect that Duskin was unconcerned.  Petitioner, on the other hand, was certainly cognizant of the potential tax consequences of the allocation, because of the obvious impact on the calculation of petitioner's foreign tax credit, as well as the possibility that the transfer of petitioner's trademarks to Duskin would generate a tax in several Asian and Pacific nations.

Petitioner's expert witness, Robert F. Reilly,[21] valued the

---

[21]Mr. Reilly was the director of the Valuation Engineering Associates Division of Touche Ross when Touche Ross prepared the allocation that petitioner used in its purchase agreement with Duskin.

covenant at $620,000,[22] almost $200,000 less than the amount
allocated by petitioner in the purchase agreement with Duskin.
Although expert opinions can assist the Court in evaluating a
claim, we are not bound by the opinion of any expert and may
reach a decision based on our own analysis of all the evidence in
the record.  Helvering v. National Grocery Co., 304 U.S. 282, 295
(1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir.
1976), affg. T.C. Memo. 1974-285.

Mr. Reilly computed the value of the covenant not to compete
under the comparative business valuation method and a discounted
net cash-flow analysis.  Utilizing this comparative approach, Mr.
Reilly computed Mister Donut's discounted net cash-flow under two
scenarios.  Scenario 1 assumed that the covenant was in place,
and petitioner could not reenter the Asian and Pacific donut
market.  Scenario 2 assumed that the purchaser did not receive a
covenant, and petitioner would reenter the market and compete.
Mr. Reilly attributed the difference in the sum of Mister Donut's
discounted net cash-flows under these two scenarios to the

---

[22]Mr. Reilly's report contained the following allocation:

| Asset | Fair Market Value |
|---|---|
| Non-compete agreement | $620,000 |
| Trade secrets and know-how | 50,000 |
| Trademarks and trade names | 370,000 |
| Existing franchise agreements | 200,000 |
| Goodwill | 810,000 |
| Total | 2,050,000 |

covenant not to compete. Mr. Reilly then added the income tax benefits of amortization over the covenant's estimated enforceable period of 5 years to determine the portion of the $2,050,000 sale price to be allocated to the covenant.

Mr. Reilly performed these calculations twice, once assuming the most likely competition scenario from petitioner in the event it reentered the Asian and Pacific market, and a second time assuming the worst case competition scenario from petitioner.[23] Mr. Reilly estimated the values of the covenant under the most likely competition scenario and the worst case competition scenario at $620,000 and $630,000, respectively. He then reconciled these differences and arrived at a final value of $620,000.

We find two difficulties with Mr. Reilly's report and his calculations. First, we are unsure whether Mr. Reilly's calculations and valuation of the covenant not to compete erroneously assumed that petitioner could reenter these Asian and Pacific markets again as "Mister Donut", despite the fact that petitioner had conveyed its existing franchise agreements, trademarks, and Mister Donut System to Duskin in the purchase agreement. For instance, Mr. Reilly testified at trial that "The

_____

[23]Under the worst case of competition from petitioner, Mr. Reilly projected that petitioner's reentry into the Asian and Pacific market would be so competitive that the purchaser of petitioner's Mister Donut franchise business would be unable to open new franchises after 1 year.

value of the [Duskin's] business would be reduced by $620,000,

due to the most likely competition from Mister Donut."  But

petitioner had already transferred its rights to Mister Donut in

the operating and nonoperating countries.  Assuming no covenant

existed, and petitioner had chosen to reenter the donut market in

these territories, it would have had to do so under a different

name.[24]

Second, Mr. Reilly computed the value of the covenant not to

compete under both the most likely and the worst cases of

competition without factoring in the likelihood of petitioner's

competition into his calculations.  Although Mr. Reilly's report

stated that there existed a less-than-50-percent chance of

petitioner's reentering the Asian and Pacific market for such

franchise operations, his calculations ignored the fact that

competition was unlikely even without a covenant.

Based on our review of the record, we conclude that $300,000

of the sale price should be allocated to the covenant not to

compete.  Respondent concedes that the amount allocable to the

---

[24]In response to respondent's pretrial inquiry, petitioner
stated that future competition from petitioner could reduce the
net income of a buyer of Mister Donut's Asian and Pacific
franchise operations by 40-45 percent.  Petitioner attributed
this reduction to the following:  (1) Formulas for the bakery
mixes, 10 percent; (2) ability to control suppliers, 30 percent;
and (3) knowledge of the business and donut market, 5 percent.
However, only the impact of the third factor, which petitioner
determined would reduce a buyer's net income by only 5 percent,
would presumably be attributable to the covenant not to compete,
as the supplier contracts and trade secrets were assets sold to
Duskin.

covenant not to compete constitutes foreign source income for purposes of computing petitioner's foreign tax credit limitation pursuant to section 904(a).

Finally, petitioner incurred $107,491 of expenses in connection with the sale to Duskin but did not allocate any portion of the expenses to the sale of the covenant not to compete. At trial, Mr. Schaefer testified that "It was my conclusion that we were selling assets, trademarks, good will, and selling expenses should be allocated to those * * * assets being sold. The covenant not to compete is--I equate to kind of a performance contract. We weren't selling anything; therefore, selling expenses should not be allocated to it." On brief, respondent argues that to the extent a portion of the sale price is allocated to the covenant and treated as foreign source income, a pro rata share of the selling expenses must necessarily be allocated to the covenant, thus reducing petitioner's foreign source income. See sec. 862(b).

Section 1.861-8(b)(1), Income Tax Regs., provides that deductions are allocated to the class of gross income to which they are definitely related. Section 1.861-8(b)(2), Income Tax Regs., provides that a deduction is "definitely related" to a class of gross income "if it is incurred as a result of, or incident to, an activity or in connection with property from which such class of gross income is derived." Accordingly, we

hold that a pro rata portion of the selling expenses must be allocated to petitioner's sale of the covenant not to compete.

<u>An appropriate order will be issued</u>.